**W. Willard WIRTZ, Secretary of Labor, Plaintiff,**

**v.**

**MAYER CONSTRUCTION CO., and Barnegat Light Development Co., Defendants.**

**Civ. No. 692–66.**

United States District Court
D. New Jersey.

Decided Oct. 16, 1968.

As Amended Oct. 24, 1968.

Charles Donahue, Sol., John A. Hughes, Regional Atty., Francis V. La Ruffa, Supervising Attorney, Joel H. Swift, Trial Atty., New York City, United States Dept. of Labor, for plaintiff.

Grosso, Beck & Mangino, by Marius Grosso, Orange, N. J., for defendants.

## OPINION

COHEN, District Judge:

The primary issue requiring determination is whether, under the Fair Labor Standards Act, 29 U.S.C. §§ 201–219,

the "enterprise concept" relating to local businesses handling goods which had moved in interstate commerce is a proper exercise by Congress of its constitutional power to regulate interstate commerce;[1] and, if so, whether it is applicable to defendants, Mayer Construction Co. and Barnegat Light Development Co., by imposing upon them an obligation for the payment of overtime compensation pursuant to the wage and hour provisions of the *Act*.

The matter was tried without a jury. The facts developed, and substantially conceded by the parties, disclose that defendants' construction business activities involved the handling of goods which had moved in interstate commerce, but which had "come to rest" and were purchased by defendants solely from suppliers within the State of New Jersey; that such goods were then handled by defendants' employees in the erection of dwellings solely within New Jersey; and that each of defendants' enterprises involved an annual gross business volume in excess of $350,000.00.

The plaintiff's argument in support of his complaint is that Congress is authorized by the commerce clause to regulate industries using goods which had been in interstate commerce but had "come to rest;" (2) under the Fair Labor Standards Act, supra, Congress has regulated such industries; (3) the construction materials used by the defendants' employees are "goods" as defined by the *Act;* and therefore, defendants' employees are covered by the *Act*.

In opposing the construction of the *Act* advanced by the plaintiff, the defendants argue that (1) the 1961 amendment, seeking to cover enterprises engaged in intrastate activities and handling good which, after movement in interstate commerce, have "come to rest" within the state, is an unconstitutional extension of the commerce power, and (2) that the building materials in their possession as ultimate consumers after purchase from local suppliers, are not "goods" within the meaning of section 203(i) of the *Act*.[2]

The attack by the defendants upon the legislation in question raises three integral issues: (1) whether Congress is empowered by the commerce clause of the United States Constitution to regulate business enterprises engaged in the handling of goods which have moved interstate, but have left the stream of interstate commerce and have come to rest within a state wherein they are solely used; (2) whether the "enterprise concept" of coverage by the *Act* is arbitrary and unreasonable in that it establishes size and industry differentiations and creates discriminatory classifications violative of the due process clause; and (3) whether the materials and supplies handled by the defendants' employees are "goods" as defined by the *Act*.

The area of dispute between these parties involves plaintiff's attempted application of the *Act*, as amended, to the defendants' business enterprises. The issues involved are of constitutional dimension.

1. 29 U.S.C. § 203(r) " 'Enterprise' means the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose * * *."
    29 U.S.C. § 203(s) " 'Enterprise engaged in commerce or in the production of *goods for commerce' means any of the* following in the activities of which employees are so engaged, including employees handling, selling, or otherwise working on goods that have been moved in or produced for commerce by any person * * *. (4) any such enterprise which is engaged in the business of construction or reconstruction, or

both, if the annual gross volume from the business of such enterprise is not less than $350,000.00 (as amended May 5, 1961, Pub.L. 87–30, § 2, 75 Stat. 65.)

2. 29 U.S.C. § 203(i) " 'Goods' means goods (including ships and marine equipment), wares, products, commodities, merchandise, or articles or subjects of commerce of any character, or any part or ingredient thereof, but does not include goods after their delivery into the actual physical possession of the ultimate consumer thereof other than a producer, manufacturer, or processor thereof."

■ At the outset, it should be observed that the enactment of the Fair Labor Standards Act of 1938, supra, was an exercise by Congress of its power to regulate commerce among the several states. United States Constitution, Art. 1, § 8, cl. 3. United States v. Darby, 312 U.S. 100, 657, 61 S.Ct. 451, 85 L.Ed. 609 (1941). By this legislation, Congress sought to foster the free flow of interstate commerce by establishing certain fair labor standards for the "general well-being of workers" in industries engaged in interstate commerce or in the production of goods for such commerce. In determining whether the original *Act* covered certain industrial activities, the test traditionally employed by the Courts thereafter was whether goods handled by the employees, sought to be covered by the Secretary of Labor, were goods which were moving in the stream of interstate commerce. Under this judicial test, once the goods left the stream of commerce and came to rest within the boundaries of a particular state, thereby exiting from the fictional "stream" of movement, employees' activities thereafter were outside the protection afforded by federal regulation of wages and hours.

■ After experience with the operation of the *Act* over the course of some 23 years, including as it did two wars and post-war economic surges and recessions, Congress determined that the declared policy of the *Act*,[3] which was intended and designed to free the chan-

nels of our national commerce from substandard labor conditions adversely affecting such commerce, was not being accomplished. Congress realized that the *Act* as written and applied was too limited in breadth and therefore inadequate to accomplish the fuller scope which it sought to attain by its original legislation. Accordingly, in 1961, the *Act* was amended to extend its coverage to workers of certain employers who came within specific provisions. This new area of legislative coverage became known as the "enterprise concept." (See note 1, ante.) In testing the encompassment of the *Act* as so amended in 1961, the traditional "stream of commerce" doctrine is no longer appropriate in regard to the "enterprise" amendments. Rather, now the inquiry is whether the employer's activities, engaging its employees in the handling of goods which had moved in interstate commerce, are such as to exert a substantial impact upon commerce among the several states, which commerce is integrally related to the national economy and the general welfare of the workers therein. Such remedial legislation is to be given a liberal interpretation in favor of coverage. Stevens v. Welcome Wagon, International, Inc., 390 F.2d 75, 78 (3 Cir. 1968). And constitutionality of federal regulation of intrastate or local activities exerting a substantial impact upon interstate commerce has recent approbation. Katzenbach v. McClung, 379 U.S. 294, 300, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964); Gold-

---

3. § 202. Congressional finding and declaration of policy

(a) The Congress finds that the existence, in industries engaged in commerce or in the production of goods for commerce, of labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers (1) causes commerce and the channels and instrumentalities of commerce to be used to spread and perpetuate such labor conditions among the workers of the several States; (2) burdens commerce and the free flow of goods in commerce; (3) constitutes an unfair method of competition in com-

merce; (4) leads to labor disputes burdening and obstructing commerce and the free flow of goods in commerce; and (5) interferes with the orderly and fair marketing of goods in commerce.

(b) It is declared to be the policy of this chapter, through the exercise by Congress of its power to regulate commerce among the several States and with foreign nations, to correct and as rapidly as practicable to eliminate the conditions above referred to in such industries without substantially curtailing employment or earning power. June 25, 1938, c. 676, § 2, 52 Stat. 1060; Oct. 26, 1949, c. 736, § 2, 63 Stat. 910.

berg v. Ed's Shopworth Supermarket, Inc., 214 F.Supp. 781 (W.D.La.1963) and Wirtz v. Melos Construction Corp., 284 F.Supp. 717 (E.D.N.Y.1968) considering the 1961 amendments *sub judice*. See State of Maryland v. Wirtz, 269 F.Supp. 826 (D.C.Md.1967) regarding the 1966 amendments to the *Act*.[4]

The rationale underlying the extended coverage of the *Act*, by the 1961 enterprise amendments, to activities wholly within a state which are subsequent to the movement of goods in interstate commerce and which intrastate activities were not covered previously by the enactment of 1938, was clearly indicated by the sponsors of the amended legislation. They concluded that subsequent activities were in fact capable of having a substantial impact upon commerce. The area now covered by the 1961 amendments had been considered originally by both Houses of Congress, but was eliminated before passage of the *Act* in 1938. See Kirschbaum Co. v. Walling, 316 U.S. 517 (1942) at pages 522–523, 62 S.Ct. 1116, 86 L.Ed. 1638. In reexamining the scope of the *Act*, in light of the economic well-being of the nation and its workers, Congress' overall view was that the local activities of employees subsequent to interstate movement of goods are equally vital to such general welfare and hence entitled to the same legislative consideration and regulation as that originally extended to the handling of goods by employees engaged in interstate commerce, or in the production of goods for such commerce, before such goods came to rest.[5]

The power of Congress to regulate local activities is established. Article 1, § 8, cl. 3, of the Constitution of the United States, confers upon Congress the power to regulate commerce among the several states, and Clause 18 thereof grants its authority to enact all laws which in its judgment shall be necessary, reasonably adapted and proper for carrying into execution the accomplishment of constitutional objectives and duties. That the exercise of Congress' power under the commerce clause, in extending the coverage of the legislation in question, is constitutional seems clear. As stated by the Supreme Court in United States v. Darby, supra, 312 U.S. at page 118, 61 S.Ct. at page 459:

"The power of Congress over interstate commerce is not confined to the regulation of commerce among the states. It extends to those activities intrastate which so affect interstate commerce or the exercise of the power of Congress over it as to make regulation of them appropriate means to the attainment of a legitimate end, the exercise of the granted power of Congress to regulate interstate commerce. See McCulloch v. [State of] Maryland, 4 Wheat. 316, 421, 4 L.Ed. 579."

Subsequent decisions of our highest court have sustained legislative regulation of local activities through the reach of the commerce power. See: Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), wherein substantial economic effect upon interstate commerce is considered; NLRB v. Reliance Fuel Oil Corp., 371 U.S. 224, 83 S.Ct. 312, 9 L.Ed.2d 279 (1963), where the legislative reach of such power is said to be "beyond doubt"; and in the recent case of Katzenbach v. McClung, supra, wherein the Supreme Court upheld the power of Congress to protect and foster commerce by extending coverage of Title II of the *1964 Civil Rights Act* to an Alabama restaurant serving food, a substantial portion of which had prior move-

---

4. Aff'd 392 U.S. 183, 88 S.Ct. 2017, 20 L. Ed.2d 1020 (1968); sustained extended coverage of the Act in 1966 to certain hospitals, institutions and schools and removed exemption of States. The "enterprise concept" of the 1961 amendments was approved also, pp. 188–193, 88 S.Ct. 2017.

5. 107 Cong.Rec. 5841 (1961); House Rept. No. 75 (87th Cong., 1st Sess., 1961); Senate Rept. No. 145 (87th Cong., 1st Sess. (1961), U.S.Code Cong. & Admin.News 1961, p. 1620.

ment in interstate commerce, since there was ample basis to conclude that racial discrimination by such a restaurant burdened interstate commerce.

█ So, also, in the present case. While the area of activity covered by the legislative ambit of the 1961 amendments is new, the old guidelines for the exercise of the commerce power are familiar. As was so succinctly stated by Chief Justice Marshall, nearly a century and a half ago in the historic case of McCulloch v. Maryland, 4 Wheat. 316, at page 421, 4 L.Ed. 579 (1819):

> "We admit, as all must admit, that the powers of government are limited, and that its limits are not to be transcended. But we think the sound construction of the constitution must allow to the national legislature that discretion, with respect to the means by which the powers it confers are to be carried into execution, which will enable that body to perform the high duties assigned to it, in the manner most beneficial to the people. Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional."

And, as declared in *Katzenbach,* those guidelines have equal vitality and validity today. Of course, as also indicated in *Katzenbach,* there are areas of activity that are beyond the power of Congress. Such are, quoting from Gibbons v. Ogden, 9 Wheat. 1, 195, 6 L.Ed. 23 (1824), 379 U.S. at page 302, 85 S.Ct. at page 383: "those which are completely within a particular State, which do not affect other States, and with which it is not necessary to interfere, for the purpose of executing some of the general powers of the government." Such then, is the delimitation of the commerce power for those who fear, as do the defendants here, the dangers of absolute power. Viewed against these criteria, the present legislation meets the test of constitutionality. Congressional intention to extend coverage of the *Act* to defendants' enterprises, that is, construction or reconstruction businesses of a certain dollar magnitude, is clearly appropriate and proper.

█ Turning now to the contention urged by the defendants that the building materials in their possession as "ultimate consumers," after purchase from local suppliers, are not "goods" within the meaning of the *Act.* In disposition of this claimed exemption from coverage as "ultimate consumers," these defendants do not fall within such a class. The burden of proving to the contrary was upon the defendants. National Mut. Ins. Co. v. Tidewater Transfer Co., 337 U.S. 582, 69 S.Ct. 1173, 93 L.Ed. 1556 (1949). This, the defendants failed to do. Nor, as urged, do building materials cease to be "goods" prior to, during, or upon delivery to them as "ultimate consumers." Such a strained construction would contradict the express language of the *Act.* Section 203(i), supra, thereof, refers to "goods after their delivery" to an "ultimate" consumer, indicating that the end of the line has been reached when goods are ultimately in the hands of a consumer from whence they move no farther. Powell v. United States Cartridge Co., 339 U.S. 497, 70 S.Ct. 755, 94 L.Ed. 1017 (1950). Obviously, these supplies are "goods" which have moved in interstate commerce to the defendants through the conduit of local suppliers and which are handled by defendants' employees in the construction of dwellings and buildings for developers or other purchasers, such as home owners who are destined to become the real ultimate consumers. Wirtz v. Melos Construction Corp., supra. These multiple "activities" are necessarily interrelated and are links in an established and continuing chain of movement within the meaning of section 203 (r) and (s) of the *Act.* For the purposes of this legislation, these goods retain the imprint of interstate movement in the hands of workers performing local activities integrally connected with com-

merce exerting a substantial impact thereon and upon the labor conditions of all workers connected therewith. It is this precise area and type of activity, among others, which the 1961 amendments sought to regulate. The use of a middleman, wholesale distributor or supplier, in the structure of our commercial enterprises has become an essential ingredient in national commerce without regard to state lines. Such merchandising methods cannot defeat the power of Congress, bestowed upon it by the Constitution, to regulate a commerce which substantially affects the national economy. As stated in the recent case of Wirtz v. Melos Construction Corp., supra, 284 F.Supp. at page 719:

> "Administrative interpretation of the statute, precedent, and the legislative history [of the 1961 amendments] all point to the conclusion that the statutory obligation to pay overtime cannot be avoided whether out-of-state purchases are made directly from manufacturers or indirectly through local distributors." [Supplied]

The defendants further urge that the questioned legislation, in its application to them, constitutes a denial of due process. Such an argument is specious. True, the Constitution does speak of liberty and prohibits its restraint without due process of law. However, it does not recognize an absolute and uncontrollable liberty. The legislative authority exercised or to be exercised within the limits of Congress' constitutional power in its proper field, such as interstate commerce, is not bound to extend its regulations to all classes and types of activity which it might *possibly* reach. The legislature is free to recognize degrees of harm and to decide to confine regulation to those areas where, in its judgment, need for such regulation is deemed to be the greatest. West Coast Hotel Co. v. Parrish, 300 U.S. 379, 400, 57 S.Ct. 578, 81 L.Ed. 703 (1937). The limited exercise of Congress' power, as here, did not exhaust its authority under the commerce clause. Legislative perimeters of the constitutional commerce power have yet to be attained. Nor is the scope of the *Act,* as enlarged by the 1961 amendments in question, coextensive or in excess of the commerce power. (See, for example, the 1966 Amendments which are not, however, factually pertinent here.) Indicative of its legislative selectivity, Congress chose to reach only those businesses having an annual gross dollar volume which it considered exerted sufficient and substantial impact upon the free flow of commerce warranting federal regulation of the working conditions of those employees affected thereby. As stated by Chief Justice Hughes in *West Coast Hotel,* at page 391, 57 S.Ct. at page 581:

> "Liberty under the Constitution is thus necessarily subject to the restraints of due process, and regulation which is reasonable in relation to its subject and is adopted in the interests of the community is due process."

The "community" in this instance happens to be the nation—the "subject" is the field of interstate commerce—and the regulation is one which is "reasonable in relation" to the working conditions of employees in certain enterprises whose activities have a substantial impact upon commerce and upon our national economy.

In conclusion, the answer to each of the three issues raised is in the affirmative, that is, (1) Congress does have the power and the authority to regulate a business whose only contact with interstate commerce is the use of goods, or materials, which have been in commerce but have come to rest wholly within a particular state; (2) Congress has appropriately exercised such power in the 1961 amendments to the *Act,* State of Maryland v. Wirtz, 392 U.S. 183, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968); and (3) the supplies and materials purchased by defendants from suppliers, which are handled by defendants' employees, are "goods" as defined by the *Act,* because defendants are not ultimate consumers—at best, they are penultimate consumers. Consequently,

the employees of defendants are covered and protected by the wage and hour provisions of the *Act*. Accordingly, the relief demanded in the complaint for judgment shall be granted.

Pursuant to Rule 52(a) F.R.Civ.P., 28 U.S.C., this opinion shall constitute the Court's findings of fact and conclusions of law. Counsel for the plaintiff shall submit an appropriate order.