George P. SHULTZ, Secretary of Labor, United States Department of Labor, Appellant,

v.

E. E. FALK, individually and as a partner in Drucker and Falk, et al., Appellees.

No. 14572.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 8, 1971.

Decided March 3, 1971.

Mack A. Player, Atty., Dept. of Labor (Laurence H. Silberman, Sol. of Labor, Bessie Margolin, Associate Sol., Marvin M. Tincher, Regional Atty., Carin Ann Clauss and David A. Drachsler, Attys., Dept. of Labor, on the brief) for appellant.

Herbert W. Kelly, Newport News, Va. (E. D. David, and Jones, Blechman, Woltz & Kelly, Newport News, Va., on the brief) for appellees.

Before WINTER, CRAVEN and BUTZNER, Circuit Judges.

WINTER, Circuit Judge:

The Secretary of Labor sued for an injunction under § 17 of the Fair Labor Standards Act, 29 U.S.C.A. §§ 201 *et seq.* to enjoin defendants from violating the minimum wage, overtime, and record-keeping provisions of the Act, and to restrain them from withholding back wages owed to their employees. Defendants are copartners carrying on a building management business and the employees concerned are maintenance workers. The district court denied relief on the grounds that the defendants were not covered by the Act during the period in question, because defendants' "annual gross volume of sales made or business done" was insufficient to effect coverage and because defendants' activities did not constitute an "enterprise." The district court also concluded that defendants were not the "employer" of the maintenance workers. We think otherwise and reverse.

## I

Defendants manage approximately thirty apartment buildings located in various cities in Virginia. In addition they engage in selling real estate and insurance. Their real estate management is carried on under contracts with the owners, some of whom are nonresidents of Virginia. Defendants advertise the availability of apartments for rent; sign, renew and cancel leases; collect rents; initiate, prosecute and settle all legal proceedings for eviction, possession of the premises and unpaid rent; make repairs and alterations; negotiate contracts for electricity, gas, fuel, water, telephone services, window cleaning, rubbish removal, repair work and other services; purchase supplies; pay all bills, including mortgage payments; prepare an operating budget for the owner's review and approval; submit periodic reports to the owner; and hire, discharge and supervise all labor and employees required for the operation and maintenance of the premises. The contracts are for specified periods, not less than a year. The owner is made responsible for all expenses except those wrongfully incurred by defendants, and the defendants hold the rent money in trust for the owner, pay expenses out of it, and periodically remit the excess to the owner. Any excess of expenses over rents collected must be made up by the owner. As payment for their services, defendants receive a fixed percentage of gross rent receipts.[1]

To carry out their contractual management duties, defendants employ various management employees, including six area managers, and various clerical employees and rental agents, all of whom are admitted by defendants to be their employees. Defendants carry out the day-to-day operations of each project through a maintenance superintendent

---

1. The size of these commissions does not appear in the record, but two sample contracts were included in the stipulation of facts. One of these provided for a 4% commission and the other for a 6%.

or project manager who is, under the supervision of the area manager, in charge of each project, and who hires, fires, and supervises the maintenance employees. Each project manager and his maintenance employees are characterized in the contract between defendants and the owner as employees of the owner, although defendants hire and fire them, promote them and make out their paychecks, for which they are reimbursed by the owners. The owners do not appear to exercise any supervisory power over the maintenance workers beyond approval or disapproval of the overall budget. The owners inspect their projects but direct their suggestions to the defendants. Occasionally, but only rarely, defendants have transferred maintenance personnel from one project to another; in each case, this was done with the knowledge of the owners. Defendants employ some maintenance personnel to work on two projects with different owners.

The owners are not parties to this suit. We are told that, viewed separately, the gross rental income of each project except one, is too small for it to be covered by the Act.

## II

The Secretary's complaint, filed in 1969, charged defendants with failing to pay the wages and keep the records required by the Act. The Fair Labor Standards Act requires covered employers to pay their employees a minimum wage of $1.60 an hour, with various exceptions, including lower rates for employees newly brought under the Act by the 1966 Amendments.[2] There is a time-and-a-half pay requirement for work beyond forty hours a week, with similar exceptions for employees recently covered.[3] Relevant record-keeping provisions are also set forth in the margin.[4]

---

2. 29 U.S.C.A. § 206 provides in part:

(a) Every employer shall pay to each of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, wages at the following rates:

(1) not less than $1.40 an hour during the first year from the effective date of the Fair Labor Standards Amendments of 1966 and not less than $1.60 an hour thereafter, except as otherwise provided in this section:

\* \* \* \* \*

(b) Every employer shall pay to each of his employees (other than an employee to whom subsection (a) (5) of this section applies) who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, and who in such workweek is brought within the purview of this section by the amendments made to this chapter by the Fair Labor Standards Amendments of 1966, wages at the following rates:

(1) not less than $1 an hour during the first year from the effective date of such amendments,

(2) not less than $1.15 an hour during the second year from such date,

(3) not less than $1.30 an hour during the third year from such date,

(4) not less than $1.45 an hour during the fourth year from such date, and

(5) not less than $1.60 an hour thereafter.

3. 29 U.S.C.A. § 207 provides in part:

(a) (1) Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

(2) No employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, and who in such workweek is brought within the purview of this subsection by the amendments made to this Act by the Fair Labor Standards Amendments of 1966—

(A) for a workweek longer than forty-four hours during the first year

---

4. See note 4 on page 344.

In the district court, defendants did not contend that the employees received these levels of pay, but denied that the Act applied, arguing that the coverage conditions of the Act were not satisfied. Defendants argued there and before us that they were not the "employer" of the workers at the apartment buildings within the meaning of the Act, and that their business was not an "enterprise" as required for application of the Act. In addition, they argued that their annual gross volume of sales was less than that required for application of the Act, and that they did not have "employees engaged in commerce."

The district court found for the defendants on the grounds that their annual volume of sales was insufficient, holding that the rents collected by defendants could not be included in gross sales. The court also expressed doubt that defendants were an "enterprise" within the meaning of the Act, because they acted solely as agents for apartment owners. Because defendants were the owners' agents, the district court concluded that the maintenance employees were employees of the project and not employees of defendants.[5]

Because of the two-year statute of limitations, 29 U.S.C.A. § 255(a), we are here concerned solely with back wages during the period after January 30, 1967, two years before the filing of the complaint.[6] In 1966, the Act was amended in ways pertinent to this case, and the amendments took effect on February 1, 1967. Thus, the 1966 amendments were in effect during all the pay periods here at issue.

### III

First, we turn to defendants' contention that they are not the employers of the workers at the apartment projects. The Act states that " 'Employer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee * * *."[7] "Employee" is defined as including "any individual employed by an employer,"[8] and "Employ" is defined as including "to suffer or permit to work."[9] These definitions are very broadly cast, and courts have accordingly found an employment relationship for purposes of the Act far more readily than would be dictated by common law doctrines. See, e. g., Rutherford Food Corp. v. McComb, 331 U.S. 722, 67 S.Ct. 1473, 91 L.Ed. 1772 (1945) (workers in slaughterhouse who removed bones from carcasses held to be employees of the slaughterhouse despite the fact that in some respects their operations were conducted like those of an in-

from the effective date of the Fair Labor Standards Amendments of 1966,
(B) for a workweek longer than forty-two hours during the second year from such date, or
(C) for a workweek longer than forty hours after the expiration of the second year from such date,
unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

4. 29 U.S.C.A. § 211 provides in part:
§ 211. Investigations, inspections, records, and homework regulations
* * * * *
(c) Every employer subject to any provision of this chapter or of any order issued under this chapter shall make, keep, and preserve such records of the persons employed by him and of the

wages, hours, and other conditions and practices of employment maintained by him, and shall preserve such records for such periods of time, and shall make such reports therefrom to the Administrator as he shall prescribe by regulation or order as necessary or appropriate for the enforcement of the provisions of this chapter or the regulations or orders thereunder.

5. Shultz v. Falk, 312 F.Supp. 608 (E.D. Va.1970).

6. 29 U.S.C.A. § 255, as amended, provides a three-year statute of limitations for wilful violators. The complaint does not allege wilful violation.

7. 29 U.S.C.A. § 203(d).

8. 29 U.S.C.A. § 203(e).

9. 29 U.S.C.A. § 203(g).

dependent contractor;) Southern Ry. Co. v. Black, 127 F.2d 280 (4 Cir. 1942) (redcaps in railroad station held employees of the railroad despite the fact that their compensation was solely derived from tipping;) McComb v. Homeworkers' Handicraft Cooperative, 176 F.2d 633 (4 Cir. 1949), cert. den., 338 U.S. 900, 70 S.Ct. 250, 94 L.Ed. 553 (1949) (pieceworkers who inserted draw strings in bags for bag manufacturers held employees of manufacturers despite the fact that their pay and work was distributed through a homeworkers' cooperative). Courts have also found that workers could have joint employers for purposes of the Act. See Mid-Continent Pipe Line Co. v. Hargrave, 129 F.2d 655 (10 Cir. 1942); Durkin v. Waldron, 130 F.Supp. 501 (W.D.La.1955).[10]

The Second Circuit has held that rental agents may be employers, jointly with the building owners. In Greenberg v. Arsenal Building Corp., 144 F.2d 292 (2 Cir. 1944) (per curiam), rev'd. in part on other grounds, 324 U.S. 697, 65 S.Ct. 895, 89 L.Ed. 1296 (1945), the Court held that a rental agent was properly found to be the employer of maintenance workers where the agent hired and supervised the workers, and paid them wages, for which it was reimbursed by the owners. The same result was reached in Asselta v. 149 Madison Avenue Corp., 65 F.Supp. 385 (S.D.N.Y.1945), affirmed, 156 F.2d 139 (2 Cir.), affd., 331 U.S. 199, 67 S.Ct. 1178, 91 L.Ed. 1432 (1946); in Shultz v. Arnheim & Neely, Inc., 324 F.Supp. 987 (W.D.Pa.1969), appeal docketed Nos. 18772–18774 (3 Cir.); and in Shultz v. Isaac T. Cook Co., 314 F.Supp. 461 (E.D.Mo.1970).

It is true that building rental agencies are not as fully vested with the powers and benefits involved in being an employer as a company which owned as well as operated its buildings would be. Rental agencies, such as defendants here, are not solely responsible for the setting of wages, nor are they the sole beneficiaries of the underpayment of wages. But they may share a substantial part of these powers and benefits. Defendants either directly or indirectly hire, fire, and supervise the building workers. Within the limits of generalized and fairly long-term budgets, they set the wages of the building workers. Even the decisions behind budget allocations appear to be considerably influenced by defendants' recommendations, since defendants are real estate management experts. We, therefore, have no doubt that defendants act "directly or indirectly in the interest of an employer in relation to an employee" and that the maintenance workers are "employees" of, and "employ[ed]" by, defendants within the statutory definition of the Act.

## IV

Next, we consider defendants' contention that they are not an "enterprise" within the meaning of the Act, the operative wages and hours sections of which apply to employees "employed in an enterprise engaged in commerce or in the production of goods for commerce * * *."[11]

"Enterprise" is defined in pertinent part as:[12]

the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose, and includes all such activities whether performed in one or more cor-

---

10. The possibility that the workers here may be jointly employed distinguishes Wirtz v. Columbian Mutual Life Ins. Co., 246 F.Supp. 198 (W.D.Tenn.1965), aff'd., 380 F.2d 903 (6 Cir. 1967), relied on by the court below. In *Columbian Mutual*, service and custodial workers were held to be employees of the building owner. No building management company was a party.

11. 29 U.S.C.A. §§ 206 and 207. These sections also apply to employees "engaged in commerce or in the production of goods for commerce" without regard to the enterprise requirement. The Secretary does not argue that the workers whose wages are at issue here are themselves engaged in commerce.

12. 29 U.S.C.A. § 203(r).

porate or other organizational units including departments of an establishment operated through leasing arrangements, but shall not include the related activities performed for such enterprise by an independent contractor \* \* \*.

The district court's doubts as to whether defendants and the employees involved are part of an enterprise arose from the fact that the various apartment projects do not constitute a part of defendants' establishment. Similarly, before us defendants have relied heavily on authorities indicating that use of common services will not readily be held to make several otherwise independent businesses part of the same enterprise. See, *e. g.,* Senate Report No. 145, 1961 U.S.Code Cong. and Admin.News, pp. 1620, 1661, 1662; Wirtz v. Hardin & Co., 253 F. Supp. 579 (N.D.Ala.1964), aff'd., 359 F.2d 792 (5 Cir. 1965) (per curiam) (Piggly Wiggly grocery stores not part of the same enterprise where all they had in common was certain shareholders and contracts entitling them to use the Piggly Wiggly name.) The argument is that since each building is run by its owner for a different business purpose, they cannot all have a common business purpose.

This argument was rejected by the court in Shultz v. Arnheim & Neely, Inc., *supra,* and we agree. It is *defendants'* activities at each building which must be held together by a common business purpose, not all the activities of all owners of apartment projects. All that the enterprise requirement entails is that the defendants maintain under "common control" or as a "unified operation" a set of "related activities" having a "common business purpose," and that their employees be employed as a part of this operation. The organization and operation of defendants' apartment management business satisfy these requirements. Defendants supervise the employees involved here through a hierarchy terminating in their central offices. The services provided are substantially similar from project to project,

and have the common purpose of maintaining and operating apartment buildings. The building workers are employed in this enterprise, since they are under defendants' control and carry out its purposes. The fact that they are employed at separate buildings does not prevent their being part of the same enterprise for purposes of the Act. See § 203(r), *supra;* Shultz v. Mack Farland & Sons Roofing Co., 413 F.2d 1296 (5 Cir. 1969) (two corporations engaged in the same business in different areas, but controlled by the same man, held to be a single enterprise); Wirtz v. Barnes Grocer Co., 398 F.2d 718 (8 Cir. 1968) (wholesale and retail grocery stores with substantially overlapping ownership held to be a single enterprise). Nor do we think that the building employees are removed from defendants' enterprise by the fact that some control over the employees may be exercised by the owners, or the fact that the employees' work under the contracts serves the owners' purposes as well as those of defendants. Defendants exercise substantial control and to a great extent their employees serve their common purposes and carry out related activities; this is enough to make them part of defendants' enterprise.

## V

■ Next, defendants contend that their annual gross volume of sales was insufficient to bring them within the requirements of the Act. Defendants' answers to interrogatories established that gross rentals collected were approximately $7,700,000 in 1967 and $8,600,000 in 1968 and that gross commissions received were $434,000 in 1967 and $463,000 in 1968.

The Act defines an "[e]nterprise engaged in commerce or in the production of goods for commerce," *inter alia,* as one which:

during the period February 1, 1967, through January 31, 1969, is an enterprise whose annual gross volume of sales made or business done is not less than $500,000 (exclusive of excise

taxes at the retail level which are separately stated) * * * and beginning February 1, 1969, in an enterprise whose annual gross volume of sales or business done is not less than $250,000 (exclusive of excise taxes at the retail level which are separately stated) * * *.[13]

Thus, the issue is whether defendants met the $500,000 volume requirement during the period February 1, 1967, through January 31, 1969. It is not disputed that the $250,000 requirement for the period after February 1, 1969, was satisfied.

The government argues that the entirety of the rents collected should be included in defendants' gross sales and business done for purposes of the Act; defendants contend that only their commission should be counted. We agree with the government's contention.

Decided cases settle the proposition that rental of property constitutes a "sale" within the meaning of the Act's enterprise coverage provisions. Wirtz v. Savannah Bank & Trust Co., 362 F.2d 857 (5 Cir. 1968); Wirtz v. First National Bank and Trust Company, 365 F.2d 641 (10 Cir. 1966); Wirtz v. Columbian Mutual Life Insurance Company, 380 F.2d 903 (6 Cir. 1967). This is so because "sell" is defined by the Act as including "any sale, exchange, consignment for sale, shipment for sale, *or other disposition*." (emphasis supplied.)[14]

The district court avoided the thrust of this proposition by holding that when rentals, i. e., "sales," were made by defendants in their capacity as agents, the measure of their volume was not gross rents (as they would be had defendants owned the buildings) but gross commissions. There is no statutory support for this distinction, and it is contrary to decided cases. The Act speaks of "any" sale—a characterization broad enough to include sales made in an agency capacity. The only exclusion from gross sales in the Act is for separately stated retail sales taxes. The legislative history indicates that, in fixing dollar volume tests, Congress was concerned not with an enterprise's income or profit but with its size and impact on commerce. S.Rep.1487, 89 Cong., 2d Sess., pp. 7–8; 2 U.S.Code Cong. & Admin.News (1966) p. 3009. Defendants' impact on commerce would appear to be the gross volume of rents it collects, not just the amounts it is entitled to pocket. It was observed in Wirtz v. First National Bank and Trust Company, *supra,* 365 F.2d at 645, with regard to a management company that it "markets the property under its control by renting or leasing space to tenants. This is a 'disposition' within the statutory definition, and, we believe, conforms with the congressional intent to set a standard of size of those businesses which would be covered by the 1961 amendments."

In two cases directly in point, the Tenth and Fifth Circuits have held that the term "annual gross volume of sales" means "gross receipts" from all sales, whether made by one as agent for another or by one for his own account. Wirtz v. First National Bank and Trust Company, *supra;* Wirtz v. Jernigan, 405 F.2d 155 (5 Cir. 1968). The *First National Bank* case involved a management company which operated an office building owned by a bank. The management company had no ownership in the property and was accountable to the bank for the rentals paid to it by the tenants. Nonetheless, the court pointed out that it was the management company which "markets the property" and the court measured its "annual gross volume of sales made" by the amount of the rentals which it received rather than simply by the amounts which it deducted to cover its "management fee" and expenses.

In the *Jernigan* case, the defendant, a restaurant owner who also operated a Greyhound bus agency, argued that his annual "sales" from the bus agency were his commissions and not the ticket receipts which he transmitted to Greyhound. How sales of bus tickets should

13. 29 U.S.C.A. § 203(s).

14. 29 U.S.C.A. § 203(k).

be measured was essential to a determination of whether Jernigan could avail himself of the retail establishment exemption of 29 U.S.C.A. § 213(a) (2), but the test for this exemption is the same as the test for application of the "enterprise coverage" provisions of the Act. The court held that the total proceeds from the ticket sales must be included in determining defendant's annual dollar volume of sales.

Two district court cases on facts virtually identical to those presented here have held "that gross rentals from defendant's [building] management activities must be included in determining its 'annual gross volume of sales made or business done.'" Shultz v. Arnheim & Neely, Inc., *supra*, 324 F.Supp. at 994; Shultz v. Isaac T. Cook Co., *supra*.

In addition to judicial authority, the Wage-Hour Administrator has consistently ruled that the annual gross volume of a real estate management company is measured by the total rentals received from the building it operates. See Opinion Letter No. 182 (September 9, 1963), and No. 227 (January 31, 1964), 91 Wage and Hour Manual 1034c, 1024. See also, Opinion signed by the Administrator on September 28, 1967, 91 Wage and Hour Manual 1034g. As we have recently pointed out, while "opinion letters are not binding on the courts, they do constitute 'a body of experienced and informed judgment' which have been 'given considerable and in some cases decisive weight.'" Shultz v. Hartin & Son, Inc., 428 F.2d 186, 191 (4 Cir. 1970).

Considering, therefore, the language of the Act, its legislative history and how it has been applied by other courts, as well as by the Wage-Hour Administrator, we conclude that the gross rents received by defendants are the proper measure to determine whether they have met the $500,000 volume test in order to be an "enterprise engaged in commerce or in the production of goods for commerce" during the period February 1, 1967, through January 31, 1969. Defendants fall within the definition.

VI

Finally, defendants contend that they have no employees engaged in commerce. The enterprise concept embodied in 26 U.S.C.A. § 203(s) requires as part of the definition of "enterprise engaged in commerce" that there be "employees engaged in commerce or the production of goods for commerce, including employees handling, selling, or otherwise working on goods that have been moved in or produced for commerce by any person." It is unnecessary for the employee to whom the Act is sought to be made applicable, himself, to be engaged in commerce; it is sufficient if another employee of the enterprise is so engaged. Maryland v. Wirtz, 392 U.S. 183, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968).

The facts stipulated by the parties in the district court include stipulations that at least two of defendants' employees at their main office in Newport News, Virginia, have been engaged in handling, preparing, mailing or otherwise working on insurance policies or other materials for transmission across state lines to each of certain named insurance companies having their offices in Pennsylvania, New Jersey, Ohio and Rhode Island. It was also stipulated that, as a regular incident of their management of rental property, employees of the buildings managed by defendants repair plumbing, heating and air conditioning units, and that substantial portions of the materials used in these activities moved across state lines. Finally, it was stipulated that, at each of three of the apartment houses managed by defendants, at least one employee has been regularly engaged in telephone and mail communications with the owners of the buildings across state lines concerning their operation. There can be no doubt that defendants do have employees engaged in commerce. *Cf.*, Maryland v. Wirtz, *supra*.

The judgment of the district court is reversed, and the case is remanded for further proceedings not inconsistent with the views expressed herein.

Reversed and remanded.