**Peter J. BRENNAN, Secretary of Labor, United States Department of Labor, Plaintiff,**

v.

**APARTMENT COMMUNITIES CORPORATION, a corporation, and Frank E. Aceirno, Individually and as an Officer of the said corporation, Defendants.**

**Civ. A. No. 4435.**

United States District Court,
D. Delaware.

May 22, 1973.

Ralph F. Keil, U. S. Atty., Alan S. Yoffie, Asst. U. S. Atty., Wilmington, Del., and Michael D. Shapiro, United States Dept. of Labor, Philadelphia, Pa., for plaintiff.

Arthur J. Sullivan, and Edward M. McNally, Morris, James, Hitchens & Williams, Wilmington, Del., for defendants.

## OPINION

EDWIN D. STEEL, Jr., District Judge:

This action was brought against Apartment Communities Corporation and Frank E. Acierno, individually and as an officer of the corporation, by the Secretary of Labor to compel future compliance with Sections 6, 7, 11, 15(a)(2) and 15(a)(5) of the Fair Labor Standards Act of 1938 as amended, 29 U.S.C. § 201 et seq. The action seeks to enjoin defendants from violating these sections and from withholding any back wages if the same should be found to be due. Cross motions for summary judgment, based upon the unverified pleadings, and a stipulation of facts have been filed. No dispute exists about any material fact.

Jurisdiction to decide the controversy exists under 29 U.S.C. § 217.

Defendants are engaged in the ownership, rental and management of apartment house complexes. Those complexes material to this action are set forth below, together with the dates on which they came under the control and ownership of the defendants:

Arundel Apartments
Limestone Road
Wilmington, Delaware
Purchased by defendants in March 1972

Lancaster Court Apartments
Lancaster Avenue
Wilmington, Delaware
Purchased by defendants in November 1971

Haverford Place
Limestone Road
Wilmington, Delaware
Purchased by defendants in June 1971

Towne Court Apartments
Newark, Delaware
Built by defendants over a period of approximately four years, with completion of construction in early 1971

Harbor House Apartments
Claymont, Delaware
Built by defendants over a three year period with construction completed in early 1971

In addition, in January 1972 defendants leased and since then have operated 640 South Avenue Apartments in Ridley Park, Pennsylvania. These six apartment complexes comprise 1,561 rental units.

The defendant's annual dollar volume of business was in excess of the statutory minimum at all times material to this action.

The above described business activities of the defendants were and are related and performed through unified operation and common control for a common business purpose.

Defendants' main office is located in Independence Mall, Concord Pike, Wilmington, Delaware. Aceirno is and at all relevant times was president and sole stockholder of Apartment Communities Corporation, and has acted directly and indirectly in its interest in relation to its employees and has been solely responsible for the employment practices of the corporate defendant.

29 U.S.C. §§ 206 and 207 require that every employer pay certain minimum wages to each of his employees "who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce. . . ." 29 U.S.C. § 211 requires an employer covered by the Act to keep records of the wages paid to and hours worked by his employees. Plaintiff alleges and defendants deny that these provisions have been violated. In short, defendants claim that they are not covered by the Act.

The specific question which the parties have stipulated is:

". . . whether defendants have employees handling or working on goods that have been moved in or produced for commerce within the meaning of section 3(s) [29 U.S.C. § 203(s)], which goods have not been delivered into the actual physical possession of the ultimate consumer within the meaning of section 3(i)[29 U.S.C. § 203(i)]." (Pretrial Order, ¶ E)

29 U.S.C. § 203(s) defines "enterprise engaged in commerce or in the production of goods for commerce" as meaning:

"an enterprise which has employees engaged in commerce or in the production of goods for commerce, including employees handling, selling, or otherwise working on goods that have been moved in or produced for commerce by any person,"

and which meets either a minimum annual dollar volume of business or is engaged in one of several specifically enumerated businesses. Defendants have stipulated that the required annual dollar volume of business was met.

29 U.S.C. § 203(i) defines "goods" as meaning:

"goods (including ships and marine equipment), wares, products, commodities, merchandise, or articles or subjects of commerce of any character, or any part or ingredient thereof, but does not include goods after their delivery into the actual physical possession of the ultimate consumer thereof other than a producer, manufacturer, or processor thereof."

29 U.S.C. § 203(b) defines "commerce" as follows:

" 'Commerce' means trade, commerce, transportation, transmission, or communication among the several States or between any State and any place outside thereof."

The employees whose activities are critical to this decision are (1) maintenance workers, and (2) office personnel.[1] Members of each of these

---

[1] At the argument plaintiff disclaimed arguing that "laborers who are engaged in clean up work" (Stipulation ¶ 5) were covered by the stipulated question.

classes are employees, § 203(e), employed by the defendants, § 203(g), who are employers, § 203(d), and the activities of defendants constitute an enterprise, § 203(r).

### Maintenance Employees

Defendants employ maintenance men in and about the apartment complexes. Each is assigned to a separate apartment complex and works exclusively for that complex. These maintenance men, at all times material hereto, have purchased and are purchasing cleaning supplies, such as soap, mops and brooms, from hardware stores located near each apartment. They also purchase occasional supplies of paint, paint brushes, hammers, nails, screws, screwdrivers, and similar implements. These employees charge such purchases directly to the corporate defendant. The goods so purchased generally have origins outside the state in which they are purchased.

Defendants' maintenance men clean apartments at the end of each tenancy. They caulk windows, clean ovens, carpets, and bathrooms, and occasionally do minor touch-up painting in the case of leaks or cracks. Major painting is subcontracted to independent contractors.

Defendants' maintenance men also perform minor plumbing repairs, such as unblocking lines or drains or changing washers. Major plumbing work is sub-contracted to an independent contractor.

All electrical repairs are performed by electrical contractors. Heating repairs are undertaken by the Delmarva Power & Light Company in the case of gas heat burners and the Gulf Oil Corporation in the case of oil heat burners.

Defendants' maintenance men perform occasional minor carpentry work, for example, the replacement of shelves or base boards. Major carpentry work is sub-contracted out.

Defendants' maintenance men also clean sidewalks and parking lots, cut grass and shrubs, and perform other related functions commonly done by apartment maintenance personnel.

At the outset the parties are at odds concerning the interpretation of § 203(s). They differ as to the meaning to be attributed to the words "including employees handling . . . or otherwise working on goods." Plaintiff contends that Congress intended that employees "handling . . . or otherwise working on goods" should be covered by the Act regardless of whether they did so "in commerce or in the production of goods for commerce", which are the words of § 203(s) immediately preceding the "including" clause. He argues that when the "including" provision was added to the Act in 1961 (and substantially reenacted in 1966),[2] Congress intended to supplement the traditional definition of "in commerce or in the production of goods for commerce" by extending its meaning to the handling or working on goods in one state which had theretofore been moved interstate or been produced in another state. In his view, whether or not the activity of the employees was performed "in commerce or in the production of goods for commerce" within previously recognized concepts was immaterial.

On the other hand the defendants argue that Congress intended that the "handling . . . or otherwise working on goods" clause should have significance only if such activity was performed by employees engaged "in commerce or in the production of goods for commerce" as theretofore understood. In this view the meaning of the "including" clause is dominated by and subordinate to the "in commerce" and "in the production of goods for commerce" language which immediately precedes it.

■ It is not necessary to settle this point. Even though the interpretation

2. The 1966 amendments reworded without substantive change this portion of § 203(s). Wirtz v. Melos Construction Corp., 408 F.2d 626, 627 n. 1 (2nd Cir. 1969).

of § 203(s) urged by plaintiff be accepted, the activities of defendants' maintenance employees are beyond the coverage of the Act. Section 203(s) refers to employees handling or otherwise working on "goods". Section 203(i) defines "goods" (see text *supra*). Prior to the time when the articles in question came into possession of defendants' employees they constituted "goods" as so defined. After they were delivered into the actual physical possession of the employees, however, they were in the possession of the defendants for whom the employees were acting. Defendants were the "ultimate consumers" and under § 203(i) the articles then ceased to have the status of "goods" (provided the defendants, the "ultimate consumers", were not "producer[s], manufacturer[s], or processor[s]" of the goods).[3] The cleaning materials and supplies acquired by defendants' employees were paid for by defendants. They were used by the employees in the performance of their duties as agents for defendants. From the time of their acquisition by defendants they were withdrawn from further traffic and sale, and moved no farther. They were then at the end of the line. In Wirtz v. Mayer Construction Co., 291 F.Supp. 514 (D.N.J.1968) the Court said:

> " . . . the end of the line has been reached when goods are ultimately in the hands of a consumer from whence they move no farther. Powell v. United States Cartridge Co., 339 U.S. 497, 70 S.Ct. 755, 94 L.Ed. 1017 (1950)." 291 F.Supp. at 519.

In Hamlet Ice Co. v. Fleming, 127 F. 2d 165, at pp. 170, 171 (4th Cir.), cert. denied, 317 U.S. 634, 63 S.Ct. 29, 87 L. Ed. 511 (1942), the Court said:

> "It seems clear that the exclusion clause [the "ultimate consumer" clause of § 203(i)] was intended to apply only to goods which, having

come into the hands of the ultimate consumer, have been withdrawn from further traffic and sale, so that interstate transportation of the goods may take place without responsibility for a prior production in violation of the standards of the Act."

In Shultz v. Arnheim & Neely, Inc., 324 F.Supp. 987 (W.D.Pa.1969), rev'd on other grounds sub nom. Hodgson v. Arnheim and Neely, Inc., 444 F.2d 609 (3rd Cir. 1971), rev'd sub nom. Brennan v. Arnheim & Neely, Inc., 410 U.S. 512, 93 S.Ct. 1138, 35 L.Ed.2d 463 1973),[4] the Court held that soap, detergent, wax and light bulbs which had moved in interstate commerce and had been used by janitors employed by the defendant, a building manager, did not constitute "goods" as defined in § 203(i) of the Act. 324 F.Supp. at 996. The Court relied upon the terms of § 203(i) of the Act as well as 29 CFR § 779.240(a) to support its conclusion that when the products and supplies came into the actual physical possession of the janitors, such materials lost their character as "goods" because they were then in the hands of the "ultimate consumer." Shultz v. Wilson Building, Inc., 320 F. Supp. 664, 669 (S.D.Tex.1970) is to the same effect.

A contrary conclusion is not justified by the cases cited by plaintiff. Hodgson v. Woolin & Son, Inc., 65 CCH Lab.Cas. ¶ 32,527 (S.D.Fla.1971) and Goldberg v. Furman Beauty Supply, Inc., 300 F.2d 16 (3rd Cir. 1962) are both inapposite. In *Woolin*, three defendants together were held to constitute an "enterprise" under § 203(r). They were generally engaged in residential and apartment development, contracting and maintenance. The "enterprise" had employees who acquired and handled chemicals, cleaning compounds, checks for bill paying purposes, and household appliances which had been produced outside of

---

3. This qualification of the "ultimate consumer" clause is discussed *infra*.

4. The Supreme Court reinstated the view of the District Court that defendant Arn-

heim and Neely, Inc. was an "enterprise" under § 203(r) of the Act. The issue whether defendant's janitors handled "goods" was not passed upon by either the Third Circuit or the Supreme Court.

Florida and had moved in interstate commerce. The Court held that these were "goods" within the meaning of § 203(s) since:

" . . . they are not consumed by defendants but pass onto the tenants, homeowners, and businesses. Directly in point here is the Third Circuit's decision in Goldberg v. Furman Beauty Supply, Inc., . . . 300 F.2d 16 (3rd Cir. 1962) ruling that lotions and rinses used by beauty salons are purchased by them for resale since the ultimate consumers of such goods are the customers of the beauty salons, and not the beauty salons themselves." 65 CCH Lab.Cas. ¶ 32,527, at 44,868.

If the products handled by the employees in fact "pass[ed] onto the tenants, homeowners, and businesses", as the *Woolin* decision states, the defendant employees were obviously not in any sense the "ultimate consumers."

The *Furman* decision, which *Woolin* states is "[d]irectly in point", is clearly distinguishable. True, in *Furman* the Court said that patrons of the defendant, a beauty parlor operator, were the "ultimate consumers" of lotions and creams which were used by the defendant in servicing its patrons. This was despite the fact that the defendant did not sell them separately or make a separate charge to the patrons for them. This was on the theory that the patrons were the beneficiaries of the lotions and creams and indirectly paid for them as part of the single overall charge for the beautification treatment.

Plaintiff contends that this theory is applicable to the facts at bar. The tenants of the apartment, he asserts, are the actual beneficiaries of the supplies and products used by the maintenance men and therefore the tenants, just as the patrons in *Furman*, were the "ultimate consumers." It is reasonable to presume that the lotions and creams constituted a substantially larger percentage of the total service charge in *Furman* than did the infinitesimal portion of the rent attributable to the cost of the supplies. This difference in degree alone relevantly differentiates the instant case from *Furman*. It is far fetched and unrealistic to say that the tenants were the ultimate consumers of the materials simply because of the miniscule amount of rent which might have been used to pay for them.

Furthermore, the *Furman* case did not deal with § 203(i) of the Act or purport to construe "ultimate consumer" as used in it. It involved the retail and service exemption in § 213(a)(2) [5] of the 1961 Act which made no mention of "ultimate consumer." The Court's use of the term "ultimate consumer" in *Furman* is of no value in illuminating the interpretation which Congress intended that "ultimate consumer" in § 203(i) should have.

Nor is Sharp v. Warner Holding Co., 70 CCH Lab.Cas. ¶ 32,821 (D.Minn. 1972) persuasive. There the Court held that supplies, originating in another state which were purchased by employees who were caretakers-managers of apartment buildings, were "goods" acquired by the defendant, the employer-officer of the buildings, and that the latter was not the "ultimate consumer". It reasoned that the "ultimate consumer" concept served to exclude products which would otherwise constitute "goods" only if they "are purchased by the employer to be part of the organic basis for the conduct of his business and are purchased to satisfy a non-recurring need." 70 CCH Lab.Cas. ¶ 32,821, at 45,714. Neither judicial decision nor legislative history is cited to support what appears to be an unwarranted qualification of the unqualified language of § 203(i).

Hodgson v. Rivermont Corporation, C.A. No. 72–327–Civ–J, decided Febru-

5. To qualify for the exemption under § 213(a)(2), as the *Furman* Court pointed out, the statute required that 75% of the annual sales volume be recognized as retail sales in the industry. The failure of the defendant to establish this, the Court said, "demolish[ed] its effort to show that the goods were 'not for resale'." 300 F.2d at 18.

ary 26, 1973, by the Jacksonville Division of the Middle District of Florida, involved the question whether a defendant who owned, managed and rented apartment units was the ultimate consumer of items it had acquired from a local supplier after the latter had acquired them from out-of-state sources. The items fell into several categories: (a) office supplies, such as pens, pencils, paper products, desks and cabinets, (b) furniture and appliances "used to furnish the apartments which the defendant owns and leases for profit", and (c) "cleansers, light bulbs and miscellaneous hardware items" used by defendant's employees in the performance of their maintenance activities. The Court held that defendant was not the ultimate consumer of these items on the theory that it effectively "sold" the items to the defendant's tenants through rent which the tenants paid and for whose use they had been procured. To the extent that the decision relates to any of the items other than the furniture and appliances used to furnish the apartments, the decision is at variance with this Court's interpretation of the Act.

Plaintiff argues, finally, that even if the defendants or their maintenance employees should otherwise be held to be "ultimate consumer[s]", nevertheless, they are "processor[s]", and because of that fact section 203(i) by its terms excepts them from the "ultimate consumer" exclusion. In none of the cases cited by plaintiff was the meaning of "processor" in § 203(i) or any other section of the Act discussed, see Shultz v. Falk, 439 F.2d 340 (4th Cir.), cert. denied sub nom. Falk v. Hodgson, 404 U.S. 827, 92 S.Ct. 62, 30 L.Ed.2d 56 (1971); Wirtz v. Melos Construction Corp., 408 F.2d 626 (2nd Cir. 1969); Irby v. Davis, 311 F.Supp. 577 (E.D.Ark.1970); Shultz v. Union Trust Bank of St. Petersburg, 297 F.Supp. 1274 (M.D.Fla.1969); Wirtz v. Washeterias, S.A., 304 F.Supp. 624 (D.Canal Zone 1968); Wirtz v. Mayer Construction Co., 291 F.Supp. 514 (D.N.J.1968), and the type of work which the employees performed in the cited cases bore no resemblance to that carried on by defendants' maintenance employees. The only exception to this statement is in the case of Shultz v. Falk, where the Court, after considering three distinct categories of employees, one of which was maintenance men, found that the employees were "engaged in commerce" without differentiating one activity from the others. 439 F.2d at 348.

■■ The statute contains no definition of "processor". It is a term of ordinary speech and means what it means in ordinary parlance. Cf. Western Union Tel. Co. v. Lenroot, 323 U.S. 490, 503, 65 S.Ct. 335, 89 L.Ed. 414 (1945). It would be stretching beyond all reason the concept of "processor", as commonly understood, to cover the activities of the maintenance employees.

In sum, the supplies handled by the maintenance employees were not "goods" within the meaning of § 203(i) and therefore their employment by defendants did not bring the latter under the coverage of the Act.

### Office Personnel

The main office of the defendants for the past year and one-half has been at Suite 42, Independence Mall, 1601 Concord Pike, Wilmington, Delaware. Among other apartments which defendant operates is one in Ridley Park, Pennsylvania. This apartment has its own resident manager, office and maintenance men. Defendants' employees in Wilmington are in direct telephone contact with the resident manager at Ridley Park on a daily basis.

The practice with regard to leases is the same for the Ridley Park apartments as for the defendants' five Delaware apartments. There are three copies of each lease, one of which is retained at the main office, one at the apartment resident manager's office, and one by the tenant. John N. Mastriana, Jr., Vice President and general property manager of Apartment Communities Corporation, visits each unit, including the Ridley Park apartments,

and signs leases, not less than once per week.

In Hodgson v. Travis Edwards, Inc., 465 F.2d 1050 (5th Cir.), cert. denied 409 U.S. 1076, 93 S.Ct. 685, 34 L.Ed.2d 665 (1972), the Court held that office employees of a building corporation were subject to the Act because they were "engaged in commerce or in the production of goods for commerce." 465 F.2d at 1052. In that case employees in Louisiana assembled daily and weekly facts and figures and forwarded them to the president in Texas. These activities were held to be within the coverage of the Act even though the documents may have had no intrinsic value and were for internal corporate use only. In one aspect, Shultz v. Falk, supra, 439 F.2d at 348, is to the same effect.

Contrary to these decisions, Stevens v. Welcome Wagon International, Inc., 390 F.2d 75 (3rd Cir. 1968), held that an employee in Pennsylvania was not "engaged in commerce or in the production of goods for commerce" when she transmitted daily, weekly and monthly reports from Pennsylvania to offices of her employer in New York and Tennessee, since they were purely internal and incidental to a local service performed by the employee. The Court followed Mitchell v. Welcome Wagon International, Inc., 139 F.Supp. 674 (W.D.Tenn. 1954), aff'd per curiam, 232 F.2d 892 (6th Cir. 1956). Under the Third Circuit decision this Court would be required to exclude defendants from the coverage of the Act were it not for the manner in which the rents paid by the Ridley Park tenants were handled. These were not inter-office transactions and hence the Welcome Wagon case is inapplicable.

The Ridley Park tenants paid their rent by mailing personal checks to the Delaware office of the defendants. Defendants' employees then personally deposited the checks in a Wilmington bank. A majority of the checks were drawn on Pennsylvania banks where the tenants had bank accounts. While there is no evidence of the fact that the checks were mailed by the Wilmington bank to the Pennsylvania banks for presentment and payment, this may be fairly inferred and the Court so finds.

■ By depositing the checks in the defendants' account at the Wilmington bank, defendants' employees started the checks on the first lap of an interstate journey and were thereby "engaging in interstate commerce." [6] Goldstein v. Dabanian, 291 F.2d 208 (3rd Cir.), cert. denied 368 U.S. 928, 82 S.Ct. 364, 7 L. Ed.2d 191 (1961) is a four square holding to this effect. In that case certain employees had cashed checks, nine per cent of which were drawn on out-of-state banks. The Court held that the checks themselves were "goods" within the meaning of the Act, and that the employees who deposited the checks which were destined for presentment and payment outside of the state were "forwarding goods in interstate commerce." 291 F.2d at 210. This activity, the Court held, would have brought the employees under the coverage of the Act, but for an exemption which they enjoyed as retail employees. That exemption, of course, has no present relevance.

Since January, 1972, when defendants first leased and operated the apartments in Ridley Park, Pennsylvania, the defendants have constituted an "enterprise engaged in commerce or in the production of goods for commerce" within the meaning of 29 U.S.C. §§ 203(r) and (s)(1). In view of this finding the parties have stipulated that the defendants have violated 29 U.S.C. §§ 206, 207, and 211 of the Act, and that injunctive relief is warranted by the facts of the case.

6. This is not precisely the question which was stipulated for decision in ¶ E of the Pretrial Order (see text supra). However, the question was raised by the Court in its letter dated April 16, 1973, to the parties. Thereafter a post trial stipulation was filed pertaining to the relevant facts, and the law on the subject was briefed by the parties in letters addressed to the Court.

The parties are requested to stipulate, if possible, the amount of the back wages which are due to the employees who have been working for them since they began to lease and operate the Ridley Park apartments.

Upon a determination, by stipulation or otherwise, of the amount due to defendants' employees, the motion by plaintiff for summary judgment will be granted and the cross-motion for summary judgment by defendants will be denied.