BRENNAN, SECRETARY OF LABOR *v.*
ARNHEIM & NEELY, INC., ET AL.

No. 71–1598.   Argued January 16, 1973—Decided February 28, 1973

STEWART, J., delivered the opinion of the Court, in which BURGER, C. J., and DOUGLAS, BRENNAN, MARSHALL, BLACKMUN, POWELL, and REHNQUIST, JJ., joined. WHITE, J., filed a dissenting opinion, *post,* p. 521.

*Andrew L. Frey* argued the cause for petitioner. With him on the briefs were *Solicitor General Griswold* and *Richard F. Schubert.*

*Eugene B. Strassburger, Jr.,* argued the cause for respondent Arnheim & Neely, Inc. *Frank L. Seamans* argued the cause for respondent Institute of Real Estate Management. With them on the brief were *Eugene B. Strassburger III* and *Robert P. Lawry.*\*

———————
\**Howard Lichtenstein* and *Marvin Dicker* filed a brief for the Realty Advisory Board on Labor Relations, Inc., as *amicus curiae* urging affirmance.

MR. JUSTICE STEWART delivered the opinion of the Court.

This case began when the Secretary of Labor sued the respondent real estate management company for alleged violations of the Fair Labor Standards Act of 1938, as amended, 52 Stat. 1060, 29 U. S. C. § 201 *et seq.* The Secretary sought an injunction against future violations of the minimum wage, overtime, and recordkeeping provisions of the Act, as well as back wages for the affected employees. An employee is entitled to the benefits of the minimum wage and maximum hours provisions of the Act if he is, *inter alia,* "employed in an enterprise engaged in commerce or in the production of goods for commerce . . . ." 29 U. S. C. §§ 206 (a), 207 (a).

As stipulated in the District Court, the respondent company manages eight commercial office buildings and one apartment complex in the Pittsburgh area. With the exception of a minor ownership interest in one of the buildings, the respondent does not own these properties. Its services are provided according to management contracts entered into with the owners. Under these contracts, the respondent obtains tenants for the buildings, negotiates and signs leases, institutes whatever legal actions are necessary with respect to these leases, and generally manages and maintains the properties. The respondent collects rental payments on behalf of the owners, and deposits them in separate bank accounts for each building. These accounts, net of management expenses and the respondent's fees, belong to the owners of the properties. Payments are periodically made from the accounts to these owners.

The respondent's services with respect to the supervisory, maintenance, and janitorial staffs of the buildings are similarly extensive. The respondent conducts the hiring, firing, payroll operations, and job supervision of

those employed in the buildings. It also fixes hours of work, and negotiates rates of pay and fringe benefits— subject to the approval of the owners. The respondent engages in collective bargaining on behalf of the owners where the building employees are unionized. 324 F. Supp. 987, 990–991.

The District Court held that the maintenance, custodial, and operational workers at the buildings managed by the respondent were "employees," and that the respondent was an "employer," within the meaning of §§ 3 (d) and 3 (e) of the Act, 29 U. S. C. §§ 203 (d), (e). 324 F. Supp., at 990–993. The District Court also held that gross rentals, rather than commissions obtained, were the proper measure of "annual gross volume of sales made or business done" for purposes of the dollar volume portion of the statutory definition of an "enterprise engaged in commerce." *Id.*, at 993–994.[1] Though it rejected the claim that the respondent was sufficiently engaged in commerce for its employees to be covered for

---

[1] In pertinent part, the statute provides that:

"(s) 'Enterprise engaged in commerce or in the production of goods for commerce' means an enterprise which has employees engaged in commerce or in the production of goods for commerce, including employees handling, selling, or otherwise working on goods that have been moved in or produced for commerce by any person, and which—

"(1) during the period February 1, 1967, through January 31, 1969, is an enterprise whose annual gross volume of sales made or business done is not less than $500,000 (exclusive of excise taxes at the retail level which are separately stated) or is a gasoline service establishment whose annual gross volume of sales is not less than $250,000 (exclusive of excise taxes at the retail level which are separately stated), and beginning February 1, 1969, is an enterprise whose annual gross volume of sales made or business done is not less than $250,000 (exclusive of excise taxes at the retail level which are separately stated) . . . ." 29 U. S. C. § 203 (s).

the time before the 1966 amendments to the Act went into effect,[2] the District Court determined that the aggregate activities of the respondent at all nine locations were "related," performed under "common control," and for "a common business purpose," thereby constituting an "enterprise" within the meaning of § 3 (r), 29 U. S. C. § 203 (r). 324 F. Supp., at 994–995.

On cross appeals, the Court of Appeals for the Third Circuit affirmed the District Court's determination that the respondent is an "employer" of the building "employees," and also affirmed the use of gross rentals of the buildings as the proper measure of "gross sales." 444 F. 2d 609, 611–612. The Court of Appeals held that the District Court erred, however, in aggregating the gross rentals of the nine properties to determine the "gross sales" of the respondent's "enterprise." Recognizing that its decision conflicted with a substantially identical case in the Fourth Circuit, *Shultz* v. *Falk,* 439 F. 2d 340, the Court of Appeals held that before separate establishments could be deemed part of a single enter-

---

[2] Section 3 (s) (3) of the Act, as enacted in 1961, referred in its definition of "[e]nterprise engaged in commerce or in the production of goods for commerce," *inter alia,* to: *"any establishment* of any such enterprise . . . *which has employees engaged in commerce or in the production of goods for commerce* if the annual gross volume of sales of such enterprise is not less than $1,000,000 . . . ." Pub. L. 87–30, 75 Stat. 65, 66 (emphasis added). The District Court construed the statute to require that two or more employees in each building be engaged in commerce in order for that building to be covered under the Act. It found that in no building were there two such employees, and therefore held that there was no coverage under the Act prior to the 1966 amendments. 324 F. Supp. 987, 995–997. The 1966 amendments, see n. 1, *supra,* required only that the "enterprise" have "employees" engaged in commerce, and under this standard the District Court found that the respondent qualified. *Id.,* at 997. Though the Government appealed on this issue, the Court of Appeals did not reach it, 444 F. 2d 609, 614.

prise, a showing of common business purpose was required. 444 F. 2d, at 613.

> "If the record in this case revealed that the retention of the Company, as agent, were accompanied by a change in the independent business purposes of the owners—for example facts such as the pooling of profits from the various buildings demonstrating a common business purpose—the result might be different. Here, however, the record reveals that the owners share no common purpose except the decision to hire the Company as their rental or management agent. . . . Without more than here presented, we think the 'enterprise' requirement of the Act has not been satisfied." *Id.*, at 614.

Without reaching the issues regarding the respondent's engagement in commerce prior to 1967, the Court of Appeals reversed and remanded for proof of the individual gross rentals of the buildings. *Ibid.* In order to resolve the intercircuit conflict, we granted the Secretary's petition for certiorari, 409 U. S. 840, which raises the question whether the management activities of the respondent at all of the buildings served should be aggregated as part of a single "enterprise" within the meaning of § 3 (r) of the Act. Since no cross-petition for certiorari was filed by the respondent, the important issues of whether the respondent is in fact an "employer" of the building workers within the meaning of the Act, and whether gross rentals rather than gross commissions should serve as the measure of "gross sales," are not before us.[3]

The concept of "enterprise" under the Fair Labor Standards Act came into being with the 1961 amendments, which substantially broadened the coverage of

---

[3] *NLRB* v. *International Van Lines,* 409 U. S. 48, 52 n. 4, and cases there cited. But see n. 8, *infra.*

the Act. Rather than confining the protections of the Act to employees who were themselves "engaged in commerce or in the production of goods for commerce," 29 U. S. C. §§ 206 (a), 207 (a), the new amendments brought those "employed in an enterprise engaged in commerce" within the ambit of the minimum wage and maximum hours provisions.[4] The Congress defined "enterprise engaged in commerce" to include a dollar volume limitation. The standard in the original amendments included "any such enterprise which has one or more retail or service establishments if the annual gross volume of sales of such enterprise is not less than $1,000,000 . . . ," 75 Stat. 66, and has since been changed to include enterprises "whose annual gross volume of sales made or business done is not less than $500,000" for the period from February 1, 1967, to January 31, 1969, and those with annual gross sales of not less than $250,000 thereafter. 29 U. S. C. § 203 (s)(1). The presence of this dollar-volume cutoff for coverage under the Act, in turn, places importance on the Act's definition of "enterprise."

The term "enterprise" is defined by the statute as follows:

> " 'Enterprise' means the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose, and includes all such activities *whether performed in one or more establishments* or by one or more corporate or other organizational units . . . ." 29 U. S. C. § 203 (r) (emphasis added).

Specific exemptions are noted, making clear that exclusive-dealership arrangements, collective-purchasing pools, franchises, and leases of business premises from large

---

[4] Pub. L. 87–30, 75 Stat. 65, 67, 69.

commercial landlords do not create "enterprises" within the meaning of the Act. *Ibid.*

The District Court correctly identified the three main elements of the statutory definition of "enterprise": related activities, unified operation or common control, and common business purpose. We believe the Court of Appeals erred in holding that the aggregate management activities of the respondent failed to meet these statutory criteria. Once the respondent is recognized to be the employer of all of the building employees, it follows quite simply that it is a single enterprise under the Act. The respondent is, after all, but one company. Its activities in all of the buildings are virtually identical, and are plainly "related" in the sense that Congress intended. As the Senate report accompanying the 1961 amendments indicated: "Within the meaning of this term, activities are 'related' when they are the same or similar . . . ." S. Rep. No. 145, 87th Cong., 1st Sess., 41. The respondent's activities, similarly, are performed "either through unified operation or common control." The respondent is a fully integrated management company directing operations at all nine buildings from its central office. For purposes of determining whether it is an "enterprise" under the Act, it is irrelevant that the relationship between the respondent and the owners is one of agency; that separate bank accounts are maintained for each building; and that the risk of loss and the chance of gain on capital investment belong to the owners, not the respondent. All that is required under the statutory definition is that the respondent's *own* activities be related and under common control or unified operation, as they plainly are.

In its analysis of this problem, the Court of Appeals placed great weight on the fact that the building owners have no relationship with one another, and have no common business purpose. This is true, but beside the point,

for the owners are not defendants in this action and it is not *their* activities that are under examination. As Judge Winter wrote in the conflicting case from the Fourth Circuit, "It is *defendants'* activities at each building which must be held together by a common business purpose, not all the activities of all owners of apartment projects." *Shultz* v. *Falk,* 439 F. 2d, at 346. In the present case, the respondent's activities at the several locations are tied together by the common business purpose of managing commercial properties for profit. The fact that the buildings are separate establishments is specifically made irrelevant by § 3 (r).

The Court of Appeals also cited the portion of the Senate report explaining the exemptions to § 3 (r), noted above, for exclusive-dealing contracts, franchises, leasing space in shopping centers, and the like:

> "The bill also contains provisions which should insure that a small local independent business, not in itself large enough to come within the new coverage, will not become subject to the act by being considered a part of a large enterprise with which it has business dealings.
>
> "The definition of 'enterprise' expressly makes it clear that a local retail or service establishment which is under independent ownership shall not be considered to be so operated and controlled as to be other than a separate enterprise because of a franchise, or group purchasing, or group advertising arrangement with other establishments or because the establishment leases premises from a person who also happens to lease premises to other retail or service establishments." S. Rep. No. 145, 87th Cong., 1st Sess., 41.

The Court of Appeals went on to stress that the building owners should not be brought under the Act simply be-

cause they dealt with a large real estate management company. This is true, but also beside the point, since we deal here with that large management company as a party and, for purposes of this case, as an employer of the employees in question. We do not hold, nor could we in this case, that the individual building owners in *their* capacity as employers [5] are to be aggregated to create some abstract "enterprise" for purposes of the Fair Labor Standards Act.[6]

It is argued that such a straightforward application of the statutory criteria to the respondent's business ignores the significance of the dollar volume limitation included in the § 3 (s) definition of "[e]nterprise engaged in commerce or in the production of goods for commerce." The Court of Appeals cited evidence in the legislative history of the 1961 amendments that indicates a purpose to exempt small businesses from the obligations of the Act. 444 F. 2d, at 613; S. Rep. No. 145, 87th Cong., 1st Sess., 5. If the individual building owners are engaged in enterprises too small to come within the reach of the Fair Labor Standards Act, reasoned the Court of Appeals, it would be "anomalous" to treat them as a single enterprise subject to the Act "merely because they hire a rental agent who manages other buildings." 444

---

[5] As both the District Court and the Court of Appeals noted, the statutory concept of "employer" is "any person acting directly or indirectly in the interest of an employer in relation to an employee . . . ." 29 U. S. C. § 203 (d). This definition was held to be broad enough that there might be "several simultaneous 'employers.'" 444 F. 2d, at 611–612. See also 324 F. Supp. 987, 992; *Wirtz* v. *Hebert*, 368 F. 2d 139; *Mid-Continent Pipe Line Co.* v. *Hargrave*, 129 F. 2d 655.

[6] Contrary to the view taken by the dissent, we specifically do not hold that "the buildings and the management company collectively are an enterprise . . . ." We deal solely with the management company and *its* "related activities performed . . . for a common business purpose."

F. 2d, at 614. Once again, however, the response to this argument is that it is the respondent management. company, not the individual building owners, that has been held in this case to be an "employer" of all the affected "employees." Furthermore, the proper measure of the respondent's size has been held to be the gross rentals produced by properties under its management. It is true that one purpose of the dollar-volume limitation in the statutory definition of "enterprise" is the exemption of small businesses, but this respondent is not such a business under these holdings of the Court of Appeals.[7] The argument to the contrary amounts to a collateral attack on the "employer" and "gross sales" determinations made below, and the respondent cannot make such an attack in the absence of a cross-petition for certiorari.[8]

We hold that the District Court was correct in aggregating all of the respondent's management activities as a single "enterprise." Accordingly, the judgment of the Court of Appeals is reversed and the case is remanded to the Court of Appeals for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE WHITE, dissenting.

It is undisputed that for the minimum wage and maximum hour requirements of the Fair Labor Standards Act, 52 Stat. 1060, as amended, 29 U. S. C. § 201 *et seq.*, to apply to all the employees involved in this case, they must be employed in. an "enterprise engaged in com-

---

[7] It is stipulated that in all relevant years, the annual gross rental income collected by the respondent exceeded $1,000,000. 324 F. Supp., at 993.

[8] We have granted certiorari in No. 72–844, *Falk* v. *Brennan, sub nom. Falk* v. *Shultz, post,* p. 954, to consider whether the proper measure of "gross sales" in this context is gross rentals collected or gross commissions, and whether maintenance employees are "employees" of the management company within the meaning of the Act.

merce or in the production of goods for commerce." [1]
29 U. S. C. §§ 203 (s), 206, and 207. An "enterprise"
for the purpose of the Act "means the related activities
performed (either through unified operation or com-
mon control) by any person or persons for a common
business purpose . . . ." *Id.,* § 203 (r). An enter-
prise, however, does not include the related activities
performed for the enterprise by an independent con-
tractor or other specified arrangements, including other-
wise independent establishments occupying premises
leased to them by the same person. *Ibid.*

But, for an "enterprise" to be "engaged in commerce
or in the production of goods for commerce," the enter-
prise must have an "annual gross volume of sales made
or business done" in an amount not less than the specified
statutory minimum. *Id.,* § 203 (s)(1). Congress did not
intend to cover all establishments by expanding the cov-
erage of the Act through the enterprise approach. In-
stead, it drew an economic line. "It is the line which the
Congress must draw in determining who shall and who
shall not be covered by a minimum wage." S. Rep. No.
145, 87th Cong., 1st Sess., 5. Nor was the definition of
enterprise intended to swallow up the exclusion of small
businesses. Related activities conducted by separate
businesses would be considered a part of an enterprise
only "where they are joined either through unified opera-

---

[1] As discussed in the majority opinion, the Act as passed in 1938,
52 Stat. 1060, covered only employees "engaged in commerce or in
the production of goods for commerce." The 1961 amendments,
75 Stat. 65–67, 69, greatly broadened the scope of the Act by
adding the "enterprise" concept to cover those employees not di-
rectly engaged in commerce or in the production of goods for com-
merce but employed by an "enterprise" that was. Therefore, those
employees in this case not engaged in commerce or in the production
of goods for commerce, must belong to an "enterprise" so engaged,
if they are to be covered.

tion or common control into a unified business system or economic unit to serve a common business purpose." *Id.,* at 41. And the express exemptions provided in § 203 (r) from the enterprise concept, the Senate Report said, would "insure that a small local independent business, not in itself large enough to come within the new coverage, will not become subject to the act by being considered a part of a large enterprise with which it has business dealings." *Ibid.*

In the case before us, nine separately and independently owned buildings leasing space to tenants employed the same management company as agent to recommend tenants, collect rents, hire, fire, and supervise employees, and maintain and operate the buildings. The Court holds that even if none of the individual building owners would itself generate gross rentals in sufficient amount to be covered by the Act, the buildings and the management company collectively are an enterprise with collective gross rentals in excess of the statutory minimums and hence covered by the Act.[2] Because it appears to me that the Court is applying the concept of enterprise in a way which ignores the economic limitations in the Act and the congressional intention they represent, I respectfully dissent.

There is no connection between these separately owned buildings other than the fact that they employ the same management company to represent them. They have a common managing agent, but that agent is separately accountable to, and must follow the perhaps diverse directions of, each of its principals. They have no unified operation, do not constitute a unified business system or an economic unit, and surely do not serve a common

---

[2] If I agreed that the building owners and their common agent were an "enterprise," I would also agree that the cumulative gross rentals would be the proper measure of coverage.

business purpose. Hence there is no "enterprise" within the meaning of the Act which covers only those "related activities" performed through unified operation or common control "for a common business purpose."

As I have indicated, Congress was not unaware of the possibility of stretching the concept "enterprise" beyond its proper bounds and sought to guard against it. The Senate Committee said: "Thus the mere fact that a group of independently owned and operated stores join together to combine their purchasing activities or to run combined advertising will not for these reasons mean that their activities are performed through unified operation or common control and they will not for these reasons be considered a part of the same 'enterprise.'" S. Rep. No. 145, 87th Cong., 1st Sess., 42. Common agents, therefore, are not sufficient to convert otherwise independent entities into an enterprise.

The Committee also said: "There may be a number of different types of arrangements established in such cases. The key in each case may be found in the answer to the question, 'Who receives the profits, suffers the losses, sets the wages and working conditions of employees, or otherwise manages the business in those respects which are the common attributes of an independent businessman operating a business for profit?'" *Ibid.*

Under this standard, there can be no question that the buildings are separate economic units and should be treated as such. The manager receives merely a commission for his services. The managing agent manages, but is subject to direction by his principal. The income and expenses for each building are accounted for separately. The owner of each building receives the profits and suffers the losses, if any. Each owner sets the wages and working conditions for each building in the sense that, although the manager negotiates such matters, he negotiates under instructions, and it is each owner who

must approve them. Each building carries a separate employer identification number. Employees are hired with respect to each building, and supplies and other items necessary for the operation of the buildings are purchased separately for each building. Should a particular building terminate its relationship with the manager, the building employees remain with the building.

The Arnheim & Neely agency unquestionably was an "employer" insofar as its relationship to each of the buildings was concerned, for 29 U. S. C. § 203 (d) defines the term employer as including "any person acting directly or indirectly in the interest of an employer in relation to an employee . . . ." But this is a far cry from concluding that the separate buildings and their common agent constitute an enterprise engaged in commerce.[3]

Unquestionably, it is the individual owner who bears the burden of the Act and if any one of them, or each of them, individually has gross sales less than the jurisdictional minimums mentioned in the Act, construing the work "enterprise" concept as the majority does distorts clear congressional intent.

---

[3] This is demonstrated by 29 CFR § 779.203, which provides that the "terms ['employer,' 'establishment,' and 'enterprise'] are not synonymous."