James D. **HODGSON**, Secretary of Labor,
U. S. Department of Labor,
Plaintiff,

v.

A. W. **CROSSLEY, INC.**, et al.,
Defendants.

No. 72 Civ. 4853 (MP).

United States District Court,
S. D. New York.

Oct. 25, 1973.

**1132**

Francis V. LaRuffa, Regional Sol., U. S. Dept. of Labor, New York City, by Ian Philip Spier, and Stephen D. Dubnoff, New York City, of counsel, for plaintiff.

Thomas J. Byrne, Newburgh, N. Y., for defendants.

### DECISION

POLLACK, District Judge.

This is a civil action by the Secretary of Labor against A. W. Crossley, Inc. ("AWC"), a construction firm, Culligan Water Conditioning Newburgh Corp. ("Culligan"), which installs and services water softening equipment, and Alfred W. Crossley ("Crossley"), the president of both of those firms, for alleged violations of the Fair Labor Standards Act as amended, 29 U.S.C. § 201 et seq. The Secretary seeks an injunction against future violations of the overtime and record keeping provisions of the Act, as well as back wages for five allegedly affected employees.

This is not Crossley's first confrontation with the Secretary over the quality of his compliance with the Act. On prior inspections in 1958, 1963, and 1967 minor violations of section 7 of the Act were found and satisfied. In both 1963 and 1967 a condition of joint employment between AWC and Culligan was found to exist. The Department of Labor has defined joint employment, *inter alia,* as occurring

> Where the employee performs work which simultaneously benefits two or more employers, or works for two or more employers at different times during the workweek, a joint employment relationship generally will be considered to exist . . . where the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or *is under common control with the other employer.* (29 C.F.R. § 791.2(b)(3) (1972)(emphasis added)).

The evidence herein established that Crossley is the principal behind both AWC and Culligan, thus invoking the "common control" definition.

AWC is a party to a collective bargaining agreement with a labor union which represents its employees, who are all paid a union approved wage. Culligan is apparently not unionized; nevertheless, its employees are paid well in excess of the federally mandated minimum wage. Both AWC and Culligan have employees engaged in commerce. The latter has an annual gross volume of sales of not less than $250,000 exclusive of excise taxes at the retail level which are separately stated.

The investigation by the Secretary, which preceded this action, was commenced in June 1971 upon the complaint of one, Robert Durling, a former employee of Culligan whose employment was terminated by Culligan following an unexpected visit to Durling's home by a supervisor at about 8:30 in the morning; he found Durling there with a Culligan-owned truck, picked up by Durling a half hour earlier, at the commencement of the work day at 8 A.M. Durling claimed he had stopped off for coffee; there was an unproven suggestion that it was for a nap. Whatever he was doing, it is clear that he was not servicing his route that morning.

Acting on Durling's complaint against his former employer, Compliance Officer Earnest DeGraw went to the offices of AWC and Culligan respectively to conduct a Fair Labor Standards Act inquiry in June 1971. He had learned from the agency's file of the earlier inspections referred to above and the results thereof. His "investigation" consisted of interviewing Durling, the complainant, at the latter's home; examining various books maintained by AWC and Culligan; and interviewing three employees of Culligan selected by him and one employed by both AWC and Culligan; no other employees of AWC were interviewed, and no supervisory personnel of any nature whatsoever were sought out or interviewed at all for corroborative or any other information.

▆▆▆ Durling told Officer DeGraw that he had worked certain hours in excess of forty (40) in a given week on certain occasions. Durling had no records to evidence this claim. Officer DeGraw made no effort to verify this self serving statement made shortly after the discharge of Durling, either by interviews of other employees or supervisory personnel or by recourse to time sheets which Durling turned in or by the company books and records. Instead, he chose to accept and proceed on Durling's story standing alone. The Court, unlike Officer DeGraw, had the opportunity to observe Durling on the witness stand, with benefit of both direct and cross examination, for a considerable period of time. The Court finds Durling's testimony to be vague, indefinite and unreliable and on his responses and the demeanor evidence resolves the issue of credibility against him and against the plaintiff on his behalf in all respects. That is to say, the Court finds as a fact that on the basis of the evidence of and pertaining to Durling, the plaintiff has not established by a fair preponderance of the credible evidence that Durling ever did in fact work any hours in excess of forty hours in any given week.

Pursuing his investigation, Officer DeGraw requested certain records from Culligan. His request lacked any recognizable degree of specificity. However, a request by a Fair Labor Standards Act Compliance Officer has two goals in view—the calculation of hours actually worked by employees and the wages properly payable therefor; and the ascertainment of whether the record-keeping provisions of the Act, 29 U.S.C. § 211(c); 29 C.F.R. § 516.1–.33 (1972), are being complied with.

Based on examination of the records that he did receive in response to his request, Officer DeGraw then proceeded to hypothesize the number of hours worked and wages received by certain other employees of Culligan.

Officer DeGraw then interviewed three selected employees of Culligan to determine if there were some irregularities in their compensation. All three of these employees of Culligan—Edward Ettell, Kenneth Mullen, and Arthur D. Riel—appeared and testified at the trial.

Officer DeGraw testified that, with one exception to be discussed in greater detail below, AWC was in compliance. He did not find it necessary to nor did he in fact conduct any personal interviews with AWC employees to arrive at this conclusion.

▆▆▆ Officer DeGraw, who has a background in accounting which includes experience with a major trunk airline as

well as an accounting firm, and also thirteen years as an office manager for Armour & Co., quite naturally expected, and in fact requested, formal accounting records of the type with which he was professionally familiar in large business enterprises. He testified at the trial that, while he did request, and was in fact given payroll and other records, it "did not occur" to him to ask for time cards or time sheets, *cf.* 29 C.F.R. § 516.6(a)(1) (1972), or any other form of informal record by which a small business might elect to keep track of such facts as time signed in and out, hours worked or individual earnings. (See 29 C.F.R. § 516.1(a) (1972) "No particular order or form or records is prescribed by the regulations in this part.") In point of fact, each employee called as a witness by the Secretary testified, without contradiction, that, to the extent that he was on an hourly wage basis, he did in fact complete and submit either a time sheet or a time card for each day worked. DeGraw testified that he had interviewed these same employees in the course of his "investigation," yet he never thought to ask for such records from either AWC or Culligan.

Edward Ettell testified that during the relevant period he was employed by Culligan as a serviceman on a salary basis of $200.00 weekly for forty hours work from October 1970 to November 1972. Thereafter, he served as service manager at a salary of $235.00 per week. During the time he was merely a serviceman, he worked occasional Saturdays—5 in approximately 56 weeks—for which he was compensated in the following manner. For each one-half day which he worked on a Saturday, he was given a full day's pay—or *twice* his basic rate of pay. Mechanically, this was accomplished by crediting him with a day of work, for which he received full pay, on a day on which he did not report for work. No evidence was adduced to show that such payment was not made within the employee's pay period, a period which was not established by any proof. Accordingly, there was no contravention of section 7(a) of the Act, 29 U.S.C. § 207(a).

In Opinion Letter No. 913, [1966–1969 Transfer Binder] CCH Lab.L.Rep. ¶30,294, at 42,309 (Dec. 27, 1968), the Wage-Hour Administrator construed the Act to allow "the employer employing one at a fixed salary for a fixed work week to lay off the employee a sufficient number of hours during some other week or weeks *of the pay period* to offset the amount of overtime worked (i. e. at the time and one-half rate) so that the desired wage or salary for the pay period covers the total amount of compensation, including overtime." (emphasis added). *Compare* Brennan v. New Jersey, 364 F.Supp. 156 (D.N.J. 1973), decided Oct. 1, 1973, where the Court said, "this is not really an exception to the rule of § 7 of the Act, but is in complete compliance therewith." (Opinion at 4.)

■ The evidence was insufficient to establish that Culligan has not complied with § 7 of the Act. The two key factors upon which a finding of noncompliance must rest, as propounded by the Administrator, are absence both of prompt and cash payment in the pay period. In the case at bar, there is no question but that Culligan's employees were compensated for overtime in cash. On the issue of promptness, which is determined by the Secretary by reference to the pay period, the evidence was insufficient. The employer is thus entitled in these circumstances to the presumption of lawful conduct.

In sum, plaintiff has not, on the basis of a showing of five Saturdays worked by Ettell at irregular times in 56 weeks, made out a basis for inferring that it was his regular practice to render services on Saturdays as part of each work week or that he was not timely compensated at overtime rates for his Saturdays. DeGraw's recalculation of the number of hours ordinarily worked in a week was not based on the facts established by the evidence herein and is erroneous.

Kenneth Mullen testified that since he was first employed by Culligan, he has worked Monday through Friday from 8:00 A.M. to 4:30 P.M. or 5:00 P.M., with at least one-half hour off for lunch and at least fifteen minutes off for coffee each day. This testimony was too vague, speculative and indefinite to warrant a finding that any work week exceeded 40 hours.

Prior to 1971, Mullen was paid on a piece work basis. Commencing in March 1971, he was paid a salary of $30.00 per day for what he testified were "the same hours". On the Saturdays on which he was called in, he was paid $35.00 for what, he testified, was usually one-half day's work. Assuming the obligation to pay a premium rate for such services, he was fully compensated on the basis of the testimony given.

Mullen testified that he has worked four Saturdays in the last year, and that these were all in weeks which also contained a paid holiday such as New Year's Day, July Fourth, Thanksgiving, or Christmas. Thus, although there are *six* days for pay purposes in such a week there are in fact only *five* days on which Mullen actually worked in any such week. Thus, applying an eight hour per day average, Mullen actually did not work in excess of forty hours in such a week, although he was in fact paid for forty-eight hours in such as a week at a rate which was presumably forty-eight times his hourly wage or six times his daily wage. Admittedly, he was not paid a premium for any of the forty-eight hours for which he *was paid*; however, he only worked forty hours, and thus was not entitled to any premium compensation whatsoever under the Act.

Plaintiff has not shown by a fair preponderance of the credible evidence any underpayment of compensation to Mullen and thus his claim must also be dismissed.

■ Arthur D. Riel, who had been dismissed by Culligan prior to the commencement of this proceeding, testified that at all times during which he was compensated on an hourly basis, he was regularly and accurately paid a time and one-half premium for all hours he worked in excess of forty hours per week. Commencing in 1970 he worked as an installer at a salary of $180.00 per workweek, which he estimated roughly as consisting of between forty and forty-two and one-half hours of work. However, this estimate was based on a cumulation of those days on which he worked eight and one-half hours (8:00 A.M. to 4:30 P.M. without, at Riel's choice, lunch), and those days on which he worked seven and one-half hours (8:00 A.M. to 3:30 P.M., again without, Riel's choice, lunch). The proof is too indefinite and insufficient on which to find that Riel worked more than a forty hour week in the ordinary course of events; there is no credible evidence before the Court that Riel worked over forty hours a week, ordinarily.

However, there were occasional departures from the ordinary course of events. On three or four Saturdays in 112 weeks, Riel worked from 8:00 A.M. to 12:00 or 12:30 P.M., with a lunch break. On one of these three or four Saturdays, he may have worked as late as 5:00 P.M. For these labors, he testified, he was paid $45.00 for a full day or $22.50 for a half day. Based on his weekly salary of $180.00, Riel was being paid a daily wage of $36.00 at straight time rates. Thus, on days when he worked an additional full day (eight hours) beyond his regular forty hour work week, he was entitled to be paid 150% of $36.00, or $54.00. In fact, he was paid only $45.00, or 125% of $36.00 for a full day's work. Mindful of Riel's forthright acknowledgment of his employer's full and fair compliance with the Act as to Riel at all times while Riel was on an hourly basis, notwithstanding his eventual dismissal by Culligan, this Court is inclined to grant Riel the benefit of any doubts or ambiguities which may exist in the record on the question of the number of Saturdays on which he actually worked, and the number of

hours he put in on each of any such days. Taking the view of the record most favorable to Riel's claim, it appears that on each of four Saturdays he was paid $45.00 for a full day's work when the Act required that he be paid $54.00. Thus, by the most liberal view of the proof—assuming he worked four Saturdays and not three, and further that he worked full days and not halves—Riel is entitled to recover a total of $36.00 in back wages, together with interest thereon as specified below, and plaintiff is accordingly entitled to have judgment entered in that amount in favor of Riel.

Officer DeGraw attempted to give a lengthy and often confusing explanation of the reasoning process which led him to conclude that Ettell, Mullen and Riel were underpaid in the amounts of $572.-76, $830.75, and $206.82, respectively, during the period under inspection. It suffices to note that the Court had before it as witnesses the very same men interviewed by Officer DeGraw and as evidence, the same records reviewed by him. On the basis of the evidence offered and the cross-examinations had, the Court finds that no violation of the Act was established 'with regard to these three employees, beyond the *de minimis* underpayment to Riel noted above. To the extent that there is any conflict between the testimony of Ettell, Mullen and Riel in open Court on the one hand, and the conclusory assertions of DeGraw on the other, the former is clearly the best evidence, and inherently the more credible. The Court was in at least as good, if not a better, position than De-Graw to evaluate the testimony and ascertain the facts therefrom.

The sole remaining employee as to whom the plaintiff claims there was an underpayment ($1,436.96) is Walter Newborn, a union general laborer employed by AWC at a salary which, in compliance with the union contract, has steadily progressed from $3.75 an hour to $5.90 an hour and is presently $7.22 an hour. After about one and one-half years in the employ of AWC, Newborn, desirous of earning some extra income, commenced to "moonlight" by working approximately fifteen hours per week for Culligan at the task of hosing down or regenerating tanks after the day's use thereof was completed. For this he was compensated at the rate of $3.75 per hour. This arrangement continued for approximately a year and a half, until Newborn suffered a heart attack and, upon being advised by his physician to cut back on the volume of his work, he elected to retain his high paying job as a general laborer—digging ditches, shoveling, and cleaning up—at the union wage of $7.22 per hour and to shed his less lucrative, although possibly less physically exacting duties as a tank regenerator at $3.75 per hour. As of the date of trial, he was still on the payroll of AWC; the termination of his services to Culligan, for health reasons, in no wise affected the retention of his job with AWC.

From the circumstances in evidence, plaintiff seeks to construct an employment by a single business "enterprise" within the meaning of section 3(r) of the Act, 29 U.S.C. § 203(r), which deals with "related activities performed (either through unified operation or common control) by any person or persons for a common business purpose." The Supreme Court has recently "identified the three main elements of the statutory definition of 'enterprise': related activities, unified operation or common control, and common business purpose." Brennan v. Arnheim & Neely, Inc., 410 U.S. 512, 518, 93 S.Ct. 1138, 1142, 35 L.Ed.2d 463 (1973). As the Supreme Court made clear, the thrust of the 1961 amendments was to "substantially [broaden] the coverage of the Act. Rather than confining the protections of the Act [merely] to employees who were *themselves 'engaged* in commerce or in the production of goods for commerce,' . . . the new amendments brought those 'employed in an *enterprise engaged* in commerce' within the ambit of the minimum wage and maximum hours provisions." *Id.* at 516–517, 93 S.Ct. at 1141. (Emphasis added).

Plaintiff has offered no proof whatsoever tending to show related activities, unified operation or common control, or common business purpose of AWC and Culligan. Indeed, what little proof plaintiff has adduced on the subject tends to support the inference that the two companies are wholly separate and in fact Officer DeGraw so regarded them. When asked on cross examination if he had examined the records pertaining to all employees of AWC, he responded that he had not and gave as his reason the fact that "that company" appeared to be in compliance. This is hardly consistent with plaintiff's theory of a single section 3 enterprise.

The facts and circumstances surrounding Walter Newborn do reveal, however, the existence of a joint employment of Newborn by AWC, his primary employer, and Culligan, his supplemental employer. *See* 29 C.F.R. § 791.2(b)(3) (1972), *supra*. Under the regulation defining joint employment,[1] Newborn was not properly paid time and a half for overtime as required by the provisions of 29 U.S.C. § 207, due to a failure to aggregate the hours he spent in the employ of AWC and Culligan. When this is done, as explained by the testimony of Officer DeGraw, it appears that Newborn was underpaid by the amount of $1,436.96 during the relevant period, and plaintiff is accordingly entitled to have judgment in that amount in favor of Newborn. Furthermore, as this is the self-same type of violation which was called to the defendants' attention by the 1963 and 1967 inspections, plaintiff is entitled to an injunction restraining defendants from failing in the future to comply with the applicable statutes, based on defendants' demonstrated propensity to overlook the mandate of 29 C.F.R. § 791.2(b)(3) (1972).

In summary, the Court finds and concludes as follows. The claim asserted by plaintiff on behalf of the ex-employee Durling was not established at trial by a fair preponderance of the credible evidence and is dismissed. The claims asserted by plaintiff on behalf of the employees Ettell and Mullen were shown at trial to be without basis in fact and are dismissed. The claims asserted by plaintiff on behalf of the employee Riel and the joint employee Newborn have been established in the amounts of $36.00 and $1,436.96, respectively, and judgment is hereby granted thereon in favor of plaintiff against defendant Culligan, payable, by consent of counsel, within 30 days of the entry hereof, together with prejudgment interest thereon from the median point of each such employee's period of employment herein involved to date of payment at the rate of $6\frac{1}{4}\%$ and costs to be taxed by the Clerk.

Furthermore, defendants, their agents and servants, are hereby jointly and severally enjoined from violating the provisions of the Fair Labor Standards Act, and in particular sections 7 and 15(a)(2) thereof, by employing any of their employees in commerce or in an enterprise engaged in commerce for workweeks longer than forty (40) hours without compensating such employees for their employment in excess of forty (40) hours in any workweeks at rates not less than one and one-half times the regular rates at which they are employed.

The foregoing shall constitute the findings of fact and conclusions of law required by Fed.R.Civ.P. 52(a).

So ordered.

---

1. Where the employee performs work which simultaneously benefits two or more employers, or works for two or more employers at different times during the workweek, a joint employment relationship generally will be considered to exist . . . where the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or *is under common control with the other employer.* (29 C.F.R. § 791.2(b)(3) (1972) (emphasis added)).