# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 96-2011

_____

Robert B. Reich, Secretary of
Labor, U.S. Department of
Labor,

               Appellee,

      v.

Thomas J. Stewart, doing
business as Stewart Trucking
& Pallet,

               Appellant.

*
*
*
*
*
*
*  Appeal from the United States
*  District Court for the
*  District of Nebraska
*
*
*
*
*

_____

Submitted:  December 12, 1996

Filed:  August 8, 1997

_____

Before McMILLIAN and MAGILL, Circuit Judges, and WEBBER,[*] District
    Judge.

_____

McMILLIAN, Circuit Judge.

_____

*The Honorable E. Richard Webber, United States District Judge
for the Eastern District of Missouri, sitting by designation.

Thomas J. Stewart appeals from a final judgment entered in the United States District Court[1] for the District of Nebraska in favor of the Secretary of Labor (Secretary) in the amount of $13,506.50 in this action filed by the Secretary pursuant to the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 201-219 (1994) (FLSA). Reich v. Stewart, No. 4:CV94-3307 (D. Neb. Mar. 7, 1996) (Judgment). For reversal, Stewart argues that the district court erred in holding (1) his employees were engaged in commerce or the production of goods for commerce; (2) he was not exempt from the FLSA pursuant to 29 U.S.C. § 203(s)(1); and (3) his employees were entitled to overtime pay. Stewart also argues that the district court lacked personal jurisdiction over a represented employee. For the reasons discussed below, we affirm the order of the district court.

## I. Background

The following facts are taken primarily from the district court order. Between September 1, 1991, and August 31, 1993, Stewart owned and operated a sole proprietorship in Lincoln, Nebraska, called Stewart Trucking and Pallet (ST&P). Part of ST&P's business consisted of "recycling," or repairing, broken shipping pallets for resale to other local businesses. Among ST&P's local customers were Cook Family Foods (Cook), Millard Refrigerated Warehouse (Millard), Gooch Milling, Nash-Finch, Sunkist Meat, Lenco, American Signature, Seward Motor Freight, and Lincoln Cartridge. Stewart regularly made truck deliveries of pallets to these businesses in Lincoln, Nebraska. Cook purchased between 374 and 935 pallets per week from ST&P for shipping boxes of processed hams to other states and Canada, with ninety-seven percent of the shipments going outside of Nebraska. At that time, Cook's annual

[1]The Honorable David L. Piester, United States Magistrate Judge for the District of Nebraska. The parties consented to have this action proceed before a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

gross volume of sales was $200,000,000.  Millard also used ST&P's pallets to ship meat to its other plants, one of which was located in Alabama.

The pallets were repaired by "pallet builders," and each builder repaired the pallets which were stocked on his or her work table when he or she arrived each morning.  The builders were paid on a piece-rate basis at fifty cents for each of the first 100 pallets repaired each day and sixty cents for each pallet repaired thereafter.  The number of pallets repaired per day by each builder varied depending on the skill and experience of the builder and the condition of the pallets.  Each builder recorded on a slip of paper the number of pallets repaired each day, and, at 3:00 p.m. each weekday, each builder submitted the slip of paper to Stewart's daughter, Jennifer Scurto, who helped run ST&P.  After checking the accuracy of each builder's daily pallet count, Scurto totaled the number of pallets repaired by each builder on a master sheet and paid the builders every Friday in accordance with that total.  Scurto also kept track of the pallet builders' tardiness and absenteeism.  However, no records were kept of each builder's daily or weekly hours.

Between January and March 1992, Joseph Petty worked for ST&P as a part-time general laborer and was paid by the hour.  In March 1992, Petty became a full-time pallet builder for ST&P and was paid primarily on a piece-rate basis.  Approximately thirty days after Petty became a full-time pallet builder, Stewart gave Petty keys to ST&P, which Petty used to open ST&P around 5:00 a.m. each weekday and to gain access on weekends.  Stewart was aware that Petty worked weekends because, occasionally, he explicitly authorized Petty to work on a particular weekend.  However, on several weekends, Stewart saw Petty at the shop and instructed him to go home.  On Monday mornings, Stewart would find the pallets that Petty had repaired during the weekend, and he always compensated Petty for that work.

Petty served as supervisor of the other pallet builders from October 1992 until April 1993.  This period was considered the "busy season," which Petty testified

coincided with the winter months. Petty's work hours depended upon the seasonal demands of ST&P. According to the United States Department of Labor's pre-trial investigation report (DOL's report) and Petty's trial testimony, he worked between fifty-five and seventy-two hours per week. Petty was paid piece-rate for all but fifty of his total hours during the non-peak season, during which he purportedly worked an average of fifty-five hours per week, and for all but 167.25 of his total hours during the peak season, during which he purportedly averaged seventy-two hours of work per week. Petty did not receive overtime, or premium, pay for his workweeks which exceeded forty hours.

Scott Hoss worked as a pallet builder for ST&P for sixteen weeks during the fall of 1992. Based upon the DOL's report and the testimony adduced at trial, Hoss's average workweek consisted of forty to forty-five hours and occasional Saturday work. During those sixteen weeks, Hoss worked twenty-five hours of overtime, for which he did not receive premium pay.

As of approximately January 1995, Stewart began paying ST&P's pallet builders an hourly wage and limited their hours to forty per week. The builders began punching a time clock, and, as of April 1995, Scurto began entering the builders' compiled time sheets into a computer. Petty was fired on January 21, 1995, for being intoxicated on the job. Petty became intoxicated on the job approximately once every three months, but, on January 21, 1995, he was particularly disruptive because of the change in the pay system for pallet builders.

The Secretary filed this action pursuant to the FLSA, alleging that Stewart violated the FLSA's recordkeeping, minimum wage, and overtime provisions during the period between September 1, 1991, and August 31, 1993. The Secretary filed this action on behalf of four ST&P employees, Petty, Hoss, Matthew Worrell, and Jimmy Uglow, and sought prospective injunctive relief barring future violations as well as back wages and liquidated damages.

This case was tried without a jury on August 16-17, 1995. The district court found that Stewart owed Petty $6,681.00 in overtime compensation and $6,681.00 in liquidated damages. Reich v. Stewart, No. 4:CV94-3307, 1996 WL 325891 (D. Neb. Mar. 7, 1996) (Memorandum of Decision) (slip op. at 22, 28-29). It further found that Stewart owed Hoss $72.25 in overtime compensation and $72.25 in liquidated damages. Id. at 24, 28-29. The district court denied relief for Worrell and Uglow because it found that their pay exceeded the minimum wage and that they did not work overtime. Id. at 17-18, 23. While the district court found that Stewart violated the recordkeeping provision of the FLSA, 29 U.S.C. § 211(c), see id. at 29, it denied the Secretary's request for prospective injunctive relief because ST&P currently appears to be in compliance with the FLSA and there is no indication that future violations will occur, id. at 15. Stewart appealed.[2]

## II. Discussion

Under the FLSA, "it shall be unlawful for any person" to violate the minimum wage, overtime, and recordkeeping provisions of that statute. 29 U.S.C. § 215(a)(2),(5). Employees who are "engaged in the production of goods for commerce" are entitled to overtime compensation for working more than forty hours in a week. See id. § 207(a). The ultimate question of whether an employee falls within the FLSA's protection is a question of law to be reviewed de novo. See Spinden v. GS Roofing Prods. Co., 94 F.3d 421, 426 (8th Cir. 1996) (citing Icicle Seafoods, Inc. v. Worthington, 475 U.S. 709, 714 (1986)), cert. denied, 117 S. Ct. 1254 (1997). However, the amount of time an employee works and the duties he or she performs present factual questions to be reviewed for clear error. See Fed. R. Civ. P. 52(a); see also Spinden v. GS Roofing Prods. Co., 94 F.3d at 426.

---

[2]Because the Secretary did not the appeal the district court's order, the facts pertaining to Worrell and Uglow are irrelevant to this appeal.

-5-

A.  Engaged in Commerce or the Production of Goods for Commerce

Stewart argues that the Secretary failed to prove by "definite and certain evidence" that ST&P was involved in commerce or the production of goods for commerce.  Brief for Appellant at 7, citing Johnson v. Blankenship, 152 F.2d 99 (8th Cir. 1945) (requiring that the plaintiff establish by a preponderance of the evidence the number of hours worked and the amount of wages due).  Stewart maintains that ST&P's employees are exempt from the FLSA because they are involved in purely local activities; specifically, ST&P's pallets were repaired in Lincoln, Nebraska, with materials purchased in Lincoln, and were returned to businesses in Lincoln.  Id. at 7-8, citing Mitchell v. C.W. Vollmer & Co., 349 U.S. 427, 429 (1955) (the test to determine whether an employee is engaged "in commerce" within the meaning of the FLSA is "whether the work is so directly and vitally related to the functioning of an instrumentality or facility of interstate commerce as to be, in practical effect, a part of it, rather than isolated, local activity"), and Wirtz v. McDaniel, 325 F.2d 78, 82 (8th Cir. 1963) (same).  Stewart contends that the Secretary presented no evidence that the pallets actually left Lincoln, Nebraska, and, therefore, the district court clearly erred in assuming that to be true.  Stewart claims that the evidence was neither sufficiently definite nor certain to prove that ST&P was involved in commerce or the production of goods for commerce.

We disagree.  The district court's factual finding that, "during the time in question, at least some of the pallets from ST&P were injected into the stream of interstate commerce," slip op. at 13, is not clearly erroneous.  Stewart testified in his pre-trial deposition that he was aware or had reason to know that pallets sold to his customers were likely used for shipments outside of Nebraska. See App. for Appellee at 14-15, 18-21.  The evidence adduced at trial showed that, during the relevant period, Cook purchased between 374 and 935 pallets per week from ST&P for shipping its processed hams, see Tr. 22:6-23:3, and ninety-seven percent of those shipments went outside of Nebraska, see Tr. 141:12-18.

Furthermore, the district court did not err in concluding that Petty and Hoss were "engaged in the production of goods for commerce" within the meaning of the FLSA. "Commerce" is defined under the FLSA as "trade, commerce, transportation, transmission, or communication among the several States or between any State and any place outside thereof." 29 U.S.C. § 203(b).

> [E]mployees are engaged in the production of goods "for" commerce when they are manufacturing, handling, working on, or otherwise engaging in the production of boxes, barrels, bagging, crates, bottles, or other containers, wrapping or packing material which their employer has reason to believe will be used to hold the goods of other producers which will be sent out of the State in such containers or wrappings. It makes no difference that such other producers are located in the same State and that the containers are sold and delivered to them there.

29 C.F.R. § 776.21(d) (1997). Because Stewart knew that the pallets rebuilt by Petty and Hoss would likely carry Cook's and other customers' goods in interstate commerce, see App. for Appellee at 14-15, 18-21, Petty and Hoss were engaged in the production of goods for commerce.

B.  Exemption under 29 U.S.C. § 203(s)(1)

Stewart argues that ST&P is exempt from the FLSA pursuant to 29 U.S.C. § 203(s)(1)[3] because, as the parties stipulated at trial, ST&P's gross receipts did not

_____

[3]29 U.S.C. § 203(s)(1) provides, in pertinent part,

"Enterprise engaged in commerce or in the production of goods for commerce" means an enterprise that--

 (A)(i) has employees engaged in commerce or in the production of goods for

exceed $500,000 during the relevant period.  <u>See</u> Tr. 18:20-19:3.  Stewart contends that, by including a statutory dollar limitation in the definition of "enterprise," Congress intended to exempt small businesses from the FLSA.  Brief for Appellant at 9, <u>citing</u> <u>Brennan v. Arnheim & Neely, Inc.</u>, 410 U.S. 512, 521 (1973) (one purpose of the dollar-volume limitation is the exemption of small businesses).  Thus, claims Stewart, even if ST&P engaged in the production of goods for commerce, the FLSA does not apply because ST&P's gross revenue was less than the statutory limit.

We disagree.  The district court did not err in holding that ST&P is not exempt from the FLSA even though its annual dollar volume was less than $500,000 during the relevant period.  Stewart misinterprets § 203(s)(1) when he claims that the exemption applies to any enterprise with gross receipts of less than $500,000.  Rather, § 203(s)(1) was enacted in 1961 to provide an alternative basis by which the FLSA governs certain <u>enterprises</u>, rather than activities of certain employees.  The Secretary's complaint is based upon the activities of ST&P's employees under the individual coverage provision, § 207(a)(1), not the enterprise provision, § 203(s)(1).  Therefore, ST&P's annual dollar volume is irrelevant.

Under the 1938 FLSA, monetary benefits extended only to employees engaged in commerce or in the production of goods for commerce.  Pub. L. 75-718, ch. 676, § 7, 52 Stat. 1063; <u>see</u> 29 U.S.C. § 207(a)(1).  In 1961, Congress broadened the FLSA's coverage[4] to include "those employed in an enterprise engaged in commerce" in

_____

commerce, or that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person; and
  (ii) is an enterprise whose annual gross volume of sales made or business done is not less than $500,000 (exclusive of excise taxes at the retail level that are separately stated).

  [4]Fair Labor Standards Amendments of 1961, Pub. L. No. 87-30, §§ 2, 6(a), 75 Stat. 65, 69.

addition to the original coverage for "employees who [are] themselves engaged in commerce or in the production of goods for commerce." Brennan v. Arnheim & Neely, Inc., 410 U.S. at 517; see Brennan v. Plaza Shoe Store, Inc., 522 F.2d 843, 846 (8th Cir. 1975). Congress intended to extend the FLSA's coverage "without departing from the act's [original] basis of coverage: engagement in 'commerce' or in the 'production of goods for commerce,'" and if the employer's annual dollar volume is insufficient to trigger enterprise coverage, "[e]mployees individually engaged in such activities . . . [will] continue to enjoy the act's benefits." S. Rep. No. 145, 87th Cong., 1st Sess. (1961), reprinted in 1961 U.S.C.C.A.N. 1620, 1644. In fact, Stewart's contention that the FLSA does not reach an employer with an annual dollar volume of less than $500,000 was refuted by Congress's recent rejection of a subsection of a proposed amendment which would have repealed the individual coverage basis and limited coverage to individuals employed by an enterprise as defined by § 203(s)(1). See 142 Cong. Rec. H5533-43 (daily ed. May 23, 1996) (reporting ayes 196, noes 229, not voting 8).

C. Overtime Compensation

Stewart argues that the district court applied improper computations in awarding overtime compensation. Stewart claims that the Secretary's computations regarding hours worked by Petty and Hoss were inaccurate because the Secretary concluded that each builder made sixteen pallets per hour, equaling eight dollars per hour (fifty-cent piece-rate), and divided each builder's weekly earnings by eight dollars to determine the hours worked per week. Stewart contends that Petty and Hoss built more than sixteen pallets per hour. Stewart also claims that Petty was paid an hourly rate as a part-time employee until April 19, 1992, rather than mid-March 1992, and the Secretary, failing to take that into account, calculated at piece-rate Petty's hours from mid-March and consequently overestimated Petty's hours. Stewart contends that Petty took breaks and often either missed work or was unproductive while at work because of his alcohol consumption. Stewart claims that he paid Petty well, as evidenced by

Petty's testimony that he was paid for his work and that he was happy with that pay and was not seeking overtime compensation. See Tr. 54:21-55:23.

The district court's factual findings underlying its computations, including its conclusion that Stewart had knowledge that Petty worked overtime, are not clearly erroneous. The district court properly based its award of back wages to Petty on credible testimony and documentary evidence due to Stewart's violation of the FLSA in failing to keep records of ST&P's employees' hours. Furthermore, Stewart challenges the calculations set forth by the Secretary at trial, rather than the district court's determinations. The district court considered the evidence adduced at trial, including the DOL's report and various witnesses' testimony, to determine the number of hours each employee worked each week during certain periods. Slip op. at 19-24. After multiplying the estimated weekly total by the number of weeks in the particular period, the district court divided the employees' total earnings during that period by the total number of hours worked during that period to arrive at an hourly wage, which was then used to compute the overtime compensation owed to each employee. Id.

"[W]hen an employer has failed to keep proper records, courts should not hesitate to award damages based on the 'just and reasonable inference' from the evidence presented." Martin v. Tony & Susan Alamo Found., 952 F.2d 1050, 1052 (8th Cir.) (citing Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687 (1946)), cert. denied, 505 U.S. 1204 (1992). "For employees paid weekly, absent explicit proof of a mutual agreement for a rate of pay capable of delineation in hourly terms, the court must infer that the 'regular rate' is substantially that calculated by dividing the total weekly compensation by the number of hours scheduled in the workweek." Mumbower v. Callicott, 526 F.2d 1183, 1187 (8th Cir. 1975) (in absence of statutorily required time records, court relied upon employee recollections to compute back wages for employee who "had her own key to the premises and served as her own supervisor"), citing Overnight Motor Transp. Co. v. Missel, 316 U.S. 572, 580 n.16 (1942) ("Wage divided by hours equals regular rate."). The district court's approach,

-10-

finding differing weekly hours for employees during peak and non-peak periods, was meticulous and based upon "the just and reasonable inference[s]" from the evidence presented. See Martin v. Tony & Susan Alamo Found., 952 F.2d at 1052. Because Stewart failed to maintain employment records required under § 11(c) of the FLSA, 29 U.S.C. § 211(c), he will not be permitted to benefit from his failure to do so. See Mumbower v. Callicott, 526 F.2d at 1186. Consequently, Stewart "cannot be heard to complain that the damages lack the exactness and precision of measurement that would be possible had [he] kept records in accordance with the [FLSA]." See Anderson v. Mt. Clemens Pottery Co., 328 U.S. at 688. Moreover, Stewart failed to show that the district court's determination that Petty missed work for alcohol-related reasons once every three months was clearly erroneous.

Stewart also argues that the district court erred in awarding Petty overtime compensation for unauthorized overtime work. Stewart maintains that to recover for Petty's unauthorized work, the Secretary must show that such work was necessary and that the time spent at ST&P was for work. Brief for Appellant at 18.

We hold that the district court did not err in concluding that overtime need not be specifically authorized by the employer for the employee to be entitled to premium pay. The key inquiry is not whether overtime work was authorized, but whether Stewart was aware that Petty was performing such work.

> The term "work" is not defined in the FLSA, but it is settled that duties performed by an employee before and after scheduled hours, even if not requested, must be compensated if the employer "knows or has reason to believe" the employee is continuing to work and the duties are an "integral and indispensable part" of the employee's principal work activity. . . . The employer who wishes no such work to be done has a duty to see it is not performed. He [or she] cannot accept the benefits without including the extra hours in the employee's weekly total for purposes of overtime compensation. If the employer has the

power and desire to prevent such work, he [or she] must make
every effort to do so.

Mumbower v. Callicott, 526 F.2d at 1188 (citations omitted). Even if Stewart had prohibited Petty's overtime work, which, presumably, he did not do because he paid Petty for such work, Stewart could not avoid liability under the FLSA because he had actual and constructive knowledge that Petty worked overtime. See Reich v. Department of Conservation & Natural Resources, 28 F.3d 1076, 1082 (11th Cir. 1994) (a court need only inquire whether, under the circumstances, the employer either had knowledge of overtime hours being worked or had the opportunity through reasonable diligence to acquire knowledge). Despite the fact that Stewart did not order Petty to work overtime, "[s]uch extra work for the employer's benefit and with his tacit approval must be included in determining whether overtime compensation is statutorily required." Mumbower v. Callicott, 526 F.2d at 1188. Moreover, the fact that Petty did not seek overtime pay is irrelevant because Petty cannot waive his entitlement to FLSA benefits. See id. (the employer's obligation to pay premium overtime compensation is statutory and cannot be waived). "A contrary holding would be detrimental to the [FLSA's] legislative policy of spreading work to more employees by requiring employers to pay each individual a premium for excessive hours." Id., citing Overnight Motor Transp. Co. v. Missel, 316 U.S. at 577-78.

D. Personal Jurisdiction

Stewart argues that the district court lacked jurisdiction over Petty because the record fails to show any written consent by Petty to be included in this lawsuit. Stewart claims that 29 U.S.C. § 216(b)[5] requires written consent by an employee to be included

_____

[5]29 U.S.C. § 216(b) provides, in pertinent part:

An action . . . may be maintained against any employer (including a public agency)

in a class action or represented action or both. Stewart maintains that, unlike class actions governed by Rule 23 of the Federal Rules of Civil Procedure, an employee must "opt in" an action under the FLSA, rather than "opt out." Brief for Appellant at 20, citing Bradford v. Peoples Natural Gas Co., 60 F.R.D. 432, 437 (W.D. Pa. 1973) (FLSA action maintained by one or more employees for and in behalf of himself or herself or themselves and others similarly situated "differs from the usual class action in that parties must 'opt in,' rather that 'opt out' as provided in [Fed. R. Civ. P. 23(c)(2)]"). Because the Secretary failed to obtain Petty's consent to this lawsuit, claims Stewart, any award of overtime back pay and liquidated damages should be dismissed.

Contrary to Stewart's characterization of this issue as based upon personal jurisdiction, he is asserting that the Secretary has failed to state a claim because employee consent is an essential element of the Secretary's claim. Because Stewart raises this argument for the first time on appeal, we need not consider the merits of the argument. See, e.g., Singleton v. Wulff, 428 U.S. 106, 120 (1976) (it is the general rule that a federal appellate court "does not consider an issue not passed upon below"); Stafford v. Ford Motor Co., 790 F.2d 702, 706 (8th Cir. 1986) (same); see also Alger v. Hayes, 452 F.2d 841, 842-43 (8th Cir. 1972) (lack of personal jurisdiction is a personal defense which may be waived if not timely asserted or properly preserved thereafter). In any event, a private FLSA action brought by one or more employees pursuant to § 216(b), which requires written consent, is distinguishable from this case

---

in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself [or herself] or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he [or she] gives his [or her] consent in writing to become such a party and such consent is filed in the court in which such action is brought.

brought by the Secretary in his representative capacity under § 216(c),[6] which does not require employee consent, because the consent requirement was deleted from § 216(c) by the Fair Labor Standards Amendments of 1974.  See Pub. L. 93-259, § 26, 88 Stat. 73.

### III. Conclusion

For the foregoing reasons, we hold that the Secretary, on behalf of Petty and Hoss, is entitled to recover overtime compensation and liquidated damages under the FLSA because Petty and Hoss were, during the relevant period, employees engaged in the production of goods for commerce.  Accordingly, we affirm the order of the district court.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

---

[6]29 U.S.C. § 216(c) provides, in pertinent part:

The Secretary may bring an action in any court of competent jurisdiction to recover the amount of unpaid minimum wages or overtime compensation and an equal amount as liquidated damages.  . . .  Any sums thus recovered by the Secretary of Labor on behalf of an employee . . . shall be paid . . . directly to the employee or employees affected.